768 July 5, 2013 No. 30

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review*,

*v.*

JAMES KENNETH WATSON
*Petitioner on Review.*

(CC 08CR0785FE; CA A144832; SC S060351)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 10, 2013.

Ernest G. Lannet, Chief Deputy Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

WALTERS, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

* Appeal from Douglas County Circuit Court, Joan Glawe Seitz, Judge. 249 Or App 179, 276 P3d 1126 (2012).

**WALTERS, J.**

In this criminal case, we consider whether a police officer violated Article I, section 9, of the Oregon Constitution when, after lawfully stopping defendant to investigate a traffic violation and deciding not to issue him a citation, the officer continued to detain defendant, conducted further investigation, and discovered evidence that defendant possessed a controlled substance. We conclude that the officer's request for defendant's driver's license, and his brief detention of defendant pending verification of defendant's driving privileges, were reasonably related to the officer's investigation of the traffic violation and were therefore lawful. We also conclude that the officer's other investigatory activities were reasonably related to the purpose for the stop or, even if they were not, either did not lead to the production of the incriminating evidence that defendant sought to suppress or were justified on other grounds. We therefore hold that the trial court did not err in denying defendant's motion to suppress, and we affirm the decision of the Court of Appeals.

In reviewing the denial of a motion to suppress, we are bound by the trial court's findings of historical fact to the extent that those findings are supported by evidence in the record. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). If the trial court did not make express findings, as is the case here, we presume that the trial court found facts that were consistent with its ultimate conclusion. *Id.* at 127. We observe that standard in stating the facts that follow. We then address the parties' legal arguments concerning the limitations imposed by Article I, section 9, and how those limitations apply to the facts.

On the evening of April 21, 2008, Officer Kris Malek of the Myrtle Creek Police Department saw a car cross over the yellow line that divided the north- and south-bound lanes of traffic. Malek stopped the car and immediately recognized defendant, who was sitting in the driver's seat. Malek knew defendant from previous traffic stops and from interacting with him socially. Approximately two months prior to the traffic stop at issue in this case, Malek had heard rumors

that defendant was dealing small amounts of marijuana around the city of Myrtle Creek.

When Malek informed defendant that he had stopped him for failure to maintain a lane, defendant responded that he had dropped his cell phone and had drifted into oncoming traffic when he reached down to retrieve it. Although Malek could have issued defendant a citation, he decided to give defendant a warning instead. Nevertheless, Malek asked for defendant's driver's license, registration, and proof of insurance. Defendant complied, and Malek called dispatch and requested records and warrants checks pursuant to his routine practice. Malek always detains drivers whom he has stopped for traffic violations until dispatch confirms that the driver in question has a valid license. Dispatch usually takes between four and 10 minutes to return the results of the checks.

Malek usually returns to his car and waits for dispatch to return the results of the records and warrants checks. In this case, however, because he had had so many friendly dealings with defendant in the past and did not feel that defendant was "a threat," Malek "had no problem standing at [defendant's] vehicle while waiting for a return from dispatch." In addition, Malek had "wanted to have a conversation with [defendant] about what [Malek had] been hearing in the community." With that purpose in mind, Malek asked defendant if he would step out of his car. Defendant complied, leaving the driver's side door ajar. Malek told defendant that he had heard rumors that defendant was dealing small amounts of marijuana. Defendant denied that allegation. The conversation "progressed," and Malek asked defendant for consent to search his car. Defendant refused and began to "yell" at Malek.

At that point, Deputy Clayton Ruble "came upon" the traffic stop, got out of his car, and approached the passenger side of defendant's car. Ruble informed Malek that he could smell "a pretty strong odor" of marijuana emanating from the partially-open window of defendant's car. Malek then stepped into the space created by the open driver's side door of the car, took "a big sniff," and also smelled "what, through

training and experience, [he] believe[d to be] marijuana coming from the vehicle." Malek contacted Probation Officer Hooly, accompanied by a drug-detection dog, to respond to the scene. While they waited, Malek and Ruble continued to question defendant. They asked him whether he had marijuana inside his car, and he responded that he had "approximately an eighth of an ounce." Officer Hooly then arrived, walked her dog around the car, and observed that the dog "hit on the vehicle," indicating the presence of a controlled substance.

At that point, Malek believed that he had probable cause to search defendant's car. He reached inside the open passenger side window and retrieved a backpack that was sitting on the passenger seat. Inside, he found marijuana, cocaine, and various drug-related paraphernalia. Malek placed defendant under arrest. A short time later, Malek received a call from dispatch that defendant's drivers license was valid and that there were no outstanding warrants for his arrest. The entire stop, from its inception until Malek arrested defendant and received the return call from dispatch, lasted approximately 10 minutes.[1] All of the actions that Malek and Ruble took occurred during the 10-minute period that the records and warrants checks were pending.

Defendant filed a motion to suppress all property seized pursuant to Malek's search of his vehicle, claiming that the stop's "intensity and duration" exceeded its legal basis. During the hearing on that motion, defendant argued that, although the officers had detained him for only 10 minutes, the police actions that occurred during that detention—in particular, Malek's drug-related questioning, his requests that defendant exit his car and consent to search, his use of the drug-detection dog, and his eventual search of defendant's car—constituted a criminal investigation that expanded the scope of the initially lawful stop beyond constitutional bounds. Without reasonable suspicion of an

---

[1] There is no evidence in the record whether the records and warrants checks are separate checks and, if so, disaggregating the time it took to conduct the records check versus the warrants check. The record states only that Malek requested that dispatch conduct both of those checks and that dispatch returned the results of both checks 10 minutes later.

additional infraction or crime, defendant argued, an officer's authority is strictly limited to a reasonable investigation of the traffic infraction that initially prompted the stop.[2]

The state responded that Malek was permitted to question defendant concerning matters that were unrelated to the stop, even if Malek had lacked reasonable suspicion to believe that defendant was engaged in criminal activity, as long as that questioning did not unreasonably prolong the stop's duration. The trial court denied defendant's motion without any explicit statement of its reasoning, and defendant was convicted of delivery and possession of marijuana and cocaine.

Defendant appealed and the Court of Appeals affirmed without opinion. *State v. Watson*, 249 Or App 179, 276 P3d 1126 (2012). Defendant petitioned for review, and we allowed review to address the constitutional limits on police action during the course of a lawful traffic stop.

Before this court, defendant renews and refines his arguments. He first argues that, after Malek pulled him over and received facially-valid documents, Malek had "everything that he needed" to complete his investigation of the traffic violation. The records and warrants checks, and the additional detention that accompanied them, thus constituted an independent investigation into other wrongdoing that exceeded both the lawful duration and scope of the stop.[3] Defendant proposes, as a rule, that, unless the nature or condition of a driver's documents gives an officer a reasonable basis to believe that the driver has committed *another* traffic violation in connection with those documents, the officer lacks any justification to detain the driver or to conduct further investigation.[4]

---

[2] Defendant also argued that Malek lacked reasonable suspicion of criminal activity even after smelling the marijuana and that the search of defendant's vehicle for an infraction quantity of marijuana could not be justified under the automobile exception to the warrant requirement. Defendant did not advance those arguments on appeal.

[3] Defendant focuses his argument on the officer's authority to seize him and on the constitutional scope of that seizure. He does not explicitly and separately argue that the records and warrants checks constituted searches that were unsupported by probable cause. We therefore do not address that issue.

[4] At oral argument, defense counsel clarified that he was not necessarily arguing that officers lack the authority to run records and warrants checks on

Defendant then argues that even if Malek's detention of defendant during the records and warrants checks was constitutionally permissible, Malek engaged in "additional shows of authority" that unconstitutionally extended the scope of the initially lawful stop. Defendant argues that, because the incriminating evidence was discovered either during Malek's illegally extended seizure of defendant or as a result of his "illegally enhanced seizure" of defendant, that evidence should be suppressed in order to restore defendant to the position that he would have held but for the illegality. The state counters that an officer's records and warrants checks always are reasonably related to the investigation of a routine traffic violation or are justified under the officer safety doctrine, and that Malek's actions during the stop did not rise to the level of an additional seizure because a reasonable person would not have believed that his liberty was restrained beyond what was entailed by the traffic stop itself.[5]

Article I, section 9, of the Oregon Constitution establishes the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."[6] That provision imposes limitations on searches and seizures "in order to prevent arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals." *State v. Tourtillott*, 289 Or 845, 853, 618 P2d 423 (1980) (quoting *United States v. Martinez-Fuerte*, 428 US 543, 554, 96 S Ct 3074, 49 L Ed 2d 1116 (1976)).

---

drivers stopped for traffic violations. Rather, he argued that officers lack the authority to detain drivers while they do so. That assertion is contrary to his brief, in which he explicitly argues that the records and warrants checks *themselves* must be supported by additional reasonable suspicion. Because the arguments concerning the scope and the duration of the checks are interrelated, we address both.

[5] On review, the state does not argue that Malek had reasonable suspicion that defendant had illegal drugs in his car that would have justified a stop of defendant on that basis.

[6] Article I, section 9, of the Oregon Constitution provides:

"The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Police encounters with individuals generally fall into one of three categories. *State v. Fair*, 353 Or 588, 593, __ P3d __ (2013) (so explaining); *see also State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991) (same). At one end of the continuum are "non-coercive encounter[s]" between an officer and an individual, which involve no restraint of liberty and thus require no justification. *Holmes*, 311 Or at 407. At the other end are arrests, which involve protracted custodial restraint and require probable cause to believe that the person arrested has committed a crime. *Fair*, 353 Or at 593. In between are "stops," which involve a temporary restraint on a person's liberty through either physical force or some other "show of authority." *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010) (citing *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010)). Although both arrests and stops are seizures for constitutional purposes, an officer may stop an individual based on reasonable suspicion of criminal activity—a lower standard than the probable cause that is required for an arrest. *Fair*, 353 Or at 593-94. An officer who lacks probable cause to arrest but who has either reasonable suspicion of criminal activity or probable cause to believe that a driver has committed an unlawful but noncriminal act, such as a traffic violation, may require the driver to pull over so that the officer can investigate further.[7] Such an interaction is a stop and a seizure for Article I, section 9, purposes, rather than a "non-coercive encounter," because

> "in contrast to a person on the street, who may unilaterally end an officer-citizen encounter at any time, the reality is that a motorist stopped for a traffic infraction is legally obligated to stop at an officer's direction *** and to interact with the officer *** and therefore is not free unilaterally to end the encounter and leave whenever he or she chooses."

*Rodgers/Kirkeby*, 347 Or at 622-23 (internal citations omitted).

---

[7] The requirement that an officer have probable cause to believe that a driver committed a traffic violation is a statutory requirement. Whether that requirement also is found in Article I, section 9, is a question that this court has reserved. *State v. Matthews*, 320 Or 398, 402 n 2, 884 P2d 1224 (1994). We need not decide that question in this case, because on review, defendant does not contest Malek's justification to effect the stop.

In the case before us, Malek's stop of defendant was lawful at its inception. Although Malek lacked probable cause to arrest defendant, he had probable cause to believe that defendant had committed a noncriminal traffic violation. Article I, section 9, permitted Malek to stop and detain defendant briefly for the purposes of investigation.[8] The central issue to which we now turn is the limits that that constitutional provision places on police conduct during the course of a lawful traffic stop and whether Malek's activities exceeded those limits.

This court has not often considered the constitutional limits on police activity during lawful traffic stops due, in part, to the role that Oregon statutory law has played in its analysis. Soon after the United States Supreme Court decided *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), in which the Court held that police officers did not violate the Fourth Amendment to the United States Constitution when they stopped and frisked the defendant, the Oregon legislature enacted statutes that were responsive to that ruling. *Terry* permitted officers with reasonable suspicion that a person was involved in criminal activity and might be armed or dangerous to stop that person, make "reasonable inquiries," and conduct a limited "patdown" search for weapons. *Id*. at 30. In *State v. Cloman*, 254 Or 1, 7, 456 P2d 67 (1969), this court borrowed the reasoning from federal Fourth Amendment juris-prudence and adopted it for the purposes of Article I, section 9. *See Fair*, 353 Or at 602-03 n 7 (so explaining). The court held that the limited detention of criminal suspects based on particularized reasonable suspicion was constitutional, recognizing that such stops were required by the "practical necessities of effective law enforcement" and emphasizing that a "brief, informal" detention for purposes of on-the-scene investigation is a more limited intrusion into a person's liberty than an arrest. *Cloman*, 254 Or at 8-9. In 1973, the Oregon legislature sought to codify the constitutional limitations that *Cloman* and

---

[8] Although defendant contested Malek's justification to effect the initial traffic stop at trial, he does not renew that argument on review.

*Terry* had articulated. ORS 131.615.[9] *See State v. Valdez*, 7 Or 621, 624-26, 561 P2d 1006 (1977) (describing origin of stop statutes); *see also Fair*, 353 Or at 602-03 n 7 (same).

Those statutes are still in effect.[10] ORS 131.615 permits the police to stop a person based on "reasonable suspicion" of criminal activity and make a "reasonable inquiry." ORS 131.615(3) provides that "[t]he inquiry shall be considered reasonable if it is limited to *** [t]he immediate circumstances that aroused the officer's suspicion" or to "[o]ther circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of criminal activity[.]" ORS 131.615(2) provides that "[t]he detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time." ORS 810.410,[11] which establishes police authority to conduct traffic stops, make arrests, and issue citations, includes similar provisions. ORS 810.410(3)(b) provides that

---

[9] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop    and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable if it is limited to:

"(a) The immediate circumstances that aroused the officer's suspicion;

"(b) Other circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of criminal activity; and

"(c) Ensuring the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(4) The inquiry may include a request for consent to search in relation to the circumstances specified in subsection (3) of this section or to search for items of evidence otherwise subject to search or seizure under ORS 133.535.

"(5) A peace officer making a stop may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer, the person stopped or other persons who are present."

[10] Those statutes have been amended since their enactment, but not in ways that affect our analysis in this case.

[11] ORS 810.410 provides, in part:

"(3) A police officer:

"*****

"(b) May stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation.

an officer may stop and detain a person "for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation." Officers may take other unrelated actions only when they have safety concerns, ORS 810.410(3)(d), or develop additional suspicion of criminal activity, ORS 810.410(3)(c). Similarly, both ORS 131.615(5) and ORS 810.410(3)(f) allow use of force only to the degree that is "reasonably necessary to make the stop and ensure the safety of the police officer, the person stopped or other persons present." Thus, by statute, an officer's authority to detain a person based on reasonable suspicion is limited to activities that are reasonably related to the investigation of the suspected violation and reasonably necessary to effectuate that investigation.

Following the enactment of ORS 131.615 and ORS 810.410, this court decided issues concerning police authority during the course of traffic stops on statutory grounds. *See, e.g.*, *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998); *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995); *State v. Porter*, 312 Or 112, 817 P2d 1306 (1991); *State v. Farley*, 308 Or 91, 775 P2d 835 (1989). Because this court analyzes statutory issues before reaching constitutional ones, the court evaluated the officers' actions in those cases to determine whether they had violated the applicable Oregon statutes and often did not explicitly address their constitutional dimensions. *See Holmes*, 311 Or at 404 ("Before reaching defendant's state and federal constitutional claims, we first examine whether the deputy sheriff acted lawfully under proper authorization by a politically accountable lawmaker."). Then, in 1997, the legislature enacted ORS

---

"(c) May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph (b) of this subsection that give rise to a reasonable suspicion of criminal activity.

"(d) May make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(e) May request consent to search in relation to the circumstances referred to in paragraph (c) of this subsection or to search for items of evidence otherwise subject to search and seizure under ORS 133.535.

"(f) May use the degree of force reasonably necessary to make the stop and ensure the safety of the police officer, the person stopped or other persons present."

136.432, which provides that courts may not exclude evidence obtained in violation of any statutory provision unless exclusion is required by the federal or state constitutions or certain rules of evidence.[12] *See Rodgers/Kirkeby*, 347 Or at 621 (describing statute). Once that statute took effect, defendants who sought to exclude evidence obtained during traffic stops asserted constitutional arguments in support of their motions to suppress, and courts were required to reach those arguments.

Since 1997, this court has decided two cases that address the limits that Article I, section 9, places on temporary seizures, or stops. The first of those cases was *Rodgers/Kirkeby*, in which the court held that, under Article I, section 9, as under ORS 810.410(3)(b), "[p]olice authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed." 347 Or at 623. The court determined that police officers had violated the constitutional rights of the defendants because, after completing their investigation of the traffic violations at issue, the officers had continued to detain the defendants and had questioned them about unrelated criminal activity without reasonable suspicion that they had engaged in such activity. The court held that Article I, section 9, "permits the police to stop and briefly detain motorists *for investigation of noncriminal traffic violations*." *Id*. at 624 (emphasis in original). Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, the court explained, "so long as the detention is limited and the police conduct is *reasonably related* to the investigation of the noncriminal traffic violation." *Id*. (emphasis added). Thus, under *Rodgers/Kirkeby*, it is the justification for the stop—

_____

[12] ORS 136.432 provides that

"[a] court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press."

the probable cause to believe that a driver has committed a traffic infraction and the state's interest in investigating that potential infraction—that delineates the lawful bounds of the traffic stop:

> "Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation."

347 Or at 623 (emphasis in original).[13]

More recently, in *Fair*, this court addressed the constitutional limits on police authority to temporarily detain or stop a person in a different noncriminal context. In *Fair*, law enforcement officers temporarily seized a woman whom they reasonably believed was a material witness or a victim of a recent or ongoing assault. After paying "due regard" both to "the practical necessities of effective law enforcement" and to the liberty interests protected by the constitution, the court held that the stop and on-the-scene detention of a likely material witness will be constitutional if

> "(1) the officer reasonably believes that an offense involving danger of forcible injury to a person recently has been committed nearby; (2) the officer reasonably believes that the person has knowledge that may aid the investigation of the suspected crime; and (3) the detention is reasonably necessary to obtain or verify the identity of the person, or to obtain an account of the crime."

*Fair*, 353 Or at 609. With that principle in mind, the court explained that the officers' warrants check and their questions concerning the defendant's arrest history did not "exceed the permissible scope of the stop," because those actions were reasonably related to the purpose of

---

[13] Whether that principle extends to inquiries during the course of a stop is a question that we do not address in this case. We also do not address the extent to which *Rodgers/Kirkeby* answers that question.

the detention. *Id.* at 614. Because the defendant lacked a driver's license or other form of identification, the officers' check for outstanding warrants was reasonably related to the purpose of determining the defendant's identity. When dispatch reported only that it had had "some form of contact" with a person with the defendant's maiden name, the officers' subsequent questions concerning the defendant's arrest history were reasonably related to their investigation of the crime of assault; specifically, the questions assisted the officers in ascertaining that the defendant did not have a prior history of domestic violence, thereby providing support for the officers' decision to arrest the defendant's husband as the assailant. *Id*. at 614.

Similar principles also are evident in this court's discussion of the limitations that Article I, section 9, imposes on officers' authority to search persons whom they have seized. For instance, in *State v. Owens*, 302 Or 196, 202, 729 P2d 524 (1986), this court held that Article I, section 9, permits officers to search without a warrant when the search is incident to arrest, but limits such searches to those related to the arrest "in time, space and intensity." The court explained that,

> "[u]nder the Oregon Constitution, a search incident to arrest is valid when it relates to a crime which there is probable cause to believe the arrestee has committed, and when it is reasonable in all the circumstances. *** This probable cause requirement properly limits the objects to be sought in searches incident to arrest, and thus limits the intensity of the search."

*Id.* at 204 (citing *State v. Caraher*, 293 Or 741, 653 P2d 942 (1982)).

An officer's authority to search in the interest of officer safety is similarly constrained. When an officer develops a reasonable suspicion that a person may pose an immediate threat of serious physical injury to the officer or to others then present, the officer may search that person without a warrant without violating Article I, section 9. *See State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). However, the scope of the search is limited to its constitutionally permitted purpose and must be reasonably necessary to

effectuate that purpose. *See [State v. Rudder](#)*, 347 Or 14, 23, 217 P3d 1064 (2009) (explaining that the protective measures that police officers take must be "proportionate" to any threat that the officers reasonably perceive). In *Rudder*, an officer who had reasonable suspicion to believe that the defendant might be armed and dangerous attempted to conduct a patdown and opened and inspected the contents of the defendant's pocket. The court explained that the patdown "was the type of limited search that this court generally has approved when officer safety concerns arise in the course of a lawful police stop" because, although a patdown constitutes an intrusion into the privacy interests of an individual, the intrusion is limited to what is reasonably necessary to "identify those objects that are relevant to *** safety concerns." *Id*. at 24. A "more intrusive" search would require "something more[,] *** either probable cause or some greater justification than was present here." *Id*. at 25.

Thus, both Oregon statutes and this court's Article I, section 9, case law require that law enforcement officers have a justification for temporarily seizing or stopping a person to conduct an investigation, and that the officer's activities be reasonably related to that investigation and reasonably necessary to effectuate it. If the officer's activities exceed those limits, then there must be an independent constitutional justification for those activities.

In applying the above principles to the facts of this case, we first note that Malek was constitutionally justified in stopping defendant. Malek had probable cause to believe that defendant had committed a noncriminal traffic infraction; therefore, Article I, section 9, permitted Malek to stop defendant and to investigate whether defendant had in fact committed that infraction. Defendant does not disagree. He contends, however, that not all of Malek's activities were reasonably related to that investigation. Defendant argues that, because Malek decided not to issue defendant a citation and did not doubt defendant's identity as it appeared on the face of defendant's driver's license, Malek exceeded the limits of Article I, section 9, by detaining defendant for 10 minutes to conduct records and warrants checks and an

unrelated criminal investigation pertaining to defendant's drug use.

We take each of the actions that defendant challenges in turn, beginning with the records check. As defendant recognizes, an officer's determination of a person's identity generally is reasonably related to the officer's investigation of a traffic infraction. Contrary to defendant's position, however, verification of a person's identity and the issuance of a citation are not the only activities that may be reasonably related to the investigation. An officer who stops a driver also may release the driver, and a reasonable investigation may therefore include a determination of whether the driver has valid driving privileges, as required by ORS 807.010.[14] As the Court of Appeals has noted, "When police officers detain a person on probable cause of violating a traffic law, it is reasonable to determine whether the person is licensed to continue on his or her way after the encounter ends." *State v. Hall*, 238 Or App 75, 79, 241 P3d 757 (2010).[15] Because Malek conducted the records check with the purpose of verifying defendant's driving privileges, Malek's detention of defendant to conduct that check did not violate Article I, section 9, unless the detention was unreasonably lengthy. *See Rodgers/Kirkeby*, 347 Or at 623 ("Police authority to detain a motorist dissipates when the

---

[14] ORS 807.010 provides, in part:

"(1) A person commits the offense of operating a vehicle without driving privileges if the person operates a motor vehicle upon a highway or premises open to the public in this state and the person does not have an appropriate grant of driving privileges from this state in the form of a license, driver permit, endorsement or statutory grant of driving privileges allowing the person to engage in the particular type of operation.

"*****

"(4) Except as provided in subsection (5) of this section, the offense described in subsection (1) of this section, operating a vehicle without driving privileges, is a Class B traffic violation."

[15] Police authority to verify records incident to "routine traffic stops" has been consistently approved and upheld by both federal and state courts. *See, e.g., United States v. Shabazz*, 993 F2d 431, 437 (5th Cir 1993) ("[W]e have no doubt, that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon *****."); *United States v. Digiovanni*, 650 F3d 498, 507 (4th Cir 2011); *United States v. Villa*, 589 F3d 1334, 1339 (10th Cir 2009); *State v. Lee*, 263 Neb 663, 658 NW 2d 669, 676 (2003); *Fender v. State*, 2003 WY 96, 74 P3d 1220, 1225 (Wyo 2003).

investigation \* \* \* is completed *or reasonably should be completed*.") (emphasis added).[16]

Malek testified that his records and warrants checks generally take between four and 10 minutes and that, in this case, the checks took approximately 10 minutes. Although defendant contends that verifying driving privileges can take much longer than simply determining whether a license is facially valid, we have concluded that Malek was entitled to verify defendant's driving privileges, and defendant does not contend that 10 minutes was an unreasonably long period of time given the particular circumstances presented.[17] We therefore conclude that Malek's detention of defendant to conduct the records check was not unreasonably lengthy.

Malek's warrants check necessitates a different analysis. In *Fair*, this court upheld a warrants check of a material witness, because the officers were unable to confirm her identity by means of a license check and because knowing whether she had a prior history of domestic violence would advance the officers' investigation of the crime at issue. *Fair*, 353 Or at 614. In this case, Malek did not testify that the warrants check was similarly related to the investigation of the traffic infraction for which he stopped defendant. Malek asked dispatch to conduct a warrants check because that was his routine practice. Whether a warrants check is reasonably related to the investigation or otherwise constitutionally justified, for instance, to protect officer

---

[16] The United States Supreme Court has similarly interpreted the Fourth Amendment, holding that an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 US 491, 500, 103 S Ct 1319, 75 L Ed 2d 229 (1983). In assessing the length of the detention, the Court takes into account whether the police diligently pursued their investigation. *United States v. Place*, 462 US 696, 709, 103 S Ct 2637, 77 L Ed 110 (1983). No rigid time limitation is imposed; rather, courts must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes, and "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 US 675, 685, 105 S Ct 1568, 84 L Ed 2d 605 (1985). The question, as always, is whether the police acted reasonably under the circumstances. *Id.* at 687.

[17] *See* Wayne R. LaFave, *The Routine Traffic Stop from Start to Finish*, 102 Mich L Rev 1843, 1875 (2004) (routine records checks usually take a matter of minutes, although the time can vary from case to case); *Shabazz*, 993 F2d at 438 (noting officer testified that a "check can take anywhere from two to three to ten to fifteen minutes").

safety, presents an important question, but one that we need not decide here.

Incriminating evidence will be suppressed only if the evidence was "a product of" an unconstitutional act. *State v. Juarez-Godinez*, 326 Or 1, 9, 942 P2d 772 (1997). In this case, the warrants check did not lead to the discovery of the evidence that defendant sought to suppress. The warrants check came back clean, and although incriminating evidence was discovered during the time that it took to conduct the warrants check, Malek's records check, which was reasonably related to the investigation, took the same amount of time. Malek requested the records and warrants checks simultaneously and received the results of those checks from dispatch simultaneously; the record does not demonstrate that it took Malek longer to conduct the warrants check than it would have taken to conduct the records check alone. There is no indication that the warrants check produced incriminating evidence or extended the duration of the stop beyond the time that was reasonably necessary to conduct the records check; thus, even if the warrants check was not reasonably related to the investigation, it was not a basis for suppression of the incriminating evidence that the police discovered.

Finally, we consider defendant's challenges to Malek's questioning of defendant concerning rumors of his involvement with drugs, Malek's requests for consent to search, and Malek's request that defendant exit his car. When we consider those acts in context, we find it unnecessary to determine whether they exceeded the constitutional scope of the stop.[18] Like the warrants check, those actions did not lead to the discovery of the evidence that defendant sought to suppress. Defendant denied selling drugs and denied Malek's request to search. Malek did not detect the odor of marijuana as a result of his request that defendant step out of his car; rather, it was Deputy Ruble's detection of the odor of marijuana coming from defendant's car, an act that defendant does not challenge, that launched the chain of events that resulted in defendant's arrest. After Ruble told

---

[18] In this case, we do not address whether an officer's inquiries made during the pendency of a valid seizure implicate Article I, section 9.

Malek that he smelled marijuana, Malek had the requisite reasonable suspicion of criminal activity that permitted him to investigate further. On investigation, Malek corroborated the odor and obtained defendant's admission that he was in possession of marijuana, as well as the drug-detection dog's confirmation that there were drugs in defendant's car. Malek then had probable cause to believe that he would find marijuana in the car and was constitutionally permitted to search it.[19] It was the series of acts that began with Ruble's detection of the odor of marijuana, and not Malek's earlier actions, that led to the discovery of evidence.

As we have explained, an officer may develop reasonable suspicion or probable cause during the course of a traffic stop that may justify activities that would not have been permissible based on the original purpose of the stop. That is exactly what occurred here. Malek developed reasonable suspicion that defendant had marijuana in his car, and that reasonable suspicion justified Malek's further investigation. Malek's confirmation of the odor, further questioning of defendant, and use of the drug-detection dog were reasonably related to that investigation and gave Malek probable cause to search defendant's car.

We conclude that the trial court did not err in denying defendant's motion to suppress. Malek's activities either were reasonably related to the investigation of the traffic infraction, did not lead to the discovery of the evidence that defendant sought to suppress, or were justified by the reasonable suspicion of criminal activity and probable cause that Malek developed during the course of the stop.

---

[19] Defendant challenged Malek's probable cause to search at trial. He did not advance that argument on appeal. At the time that Malek searched defendant's vehicle, two officers had smelled marijuana, defendant had admitted that there was marijuana in the car, and a drug detection dog had indicated that there were drugs in the car. Pursuant to the "automobile exception," an officer who has stopped a mobile vehicle may conduct a search without a warrant if the officer has probable cause to believe that the vehicle contains evidence of a crime. *See State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986) (describing exception). We accept the trial court judge's implicit finding that Malek had probable cause to conduct the search as supported by the evidence in the record: The smell, admission, and drug-dog detection were sufficient to create the requisite probable cause of criminal activity. *See State v. Foster*, 350 Or 161, 170, 252 P3d 292 (2011) (alert by properly trained and reliable drug-detection dog can provide probable cause for search).

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.