Submitted May 28, 2020, reversed and remanded April 7, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

EVAN ALLEN MOCK,
aka Evan Alen Mock,
*Defendant-Appellant.*

Union County Circuit Court
18CR14290; A169059

485 P3d 295

Defendant appeals from a judgment of conviction for conspiracy to deliver oxycodone, ORS 161.450(2)(b). Following a traffic stop, detectives initiated a criminal drug investigation, seized defendant's phone, and subsequently searched that phone pursuant to a warrant, resulting in defendant's indictment for the above crime. Defendant moved to suppress the evidence, challenging the extension of the traffic stop, the warrantless seizure of the phone, and the warranted search of the phone. The trial court denied the motion in its entirety. On appeal, defendant raises three assignments of error, repeating his arguments below. *Held*: The trial court erred in denying defendant's suppression motion, because the criminal drug investigation was not supported by reasonable suspicion. All evidence discovered as a result of that investigation, including evidence discovered on defendant's phone, was inadmissible.

Reversed and remanded.

Thomas B. Powers, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Laura A. Frikert, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

Defendant appeals from a judgment of conviction for conspiracy to deliver oxycodone, ORS 161.450(2)(b). Following a traffic stop, detectives initiated a criminal drug investigation, seized defendant's phone, and subsequently searched that phone pursuant to a search warrant, resulting in defendant's indictment for the above crime. Although defendant raises three separate assignments of error, we only substantively address one: defendant's claim that the trial court erred when it denied his motion to suppress evidence obtained by the extension of the traffic stop.[1] Defendant argues that the detectives abandoned their traffic-infraction investigation and began a criminal drug investigation without reasonable suspicion that defendant was engaged in criminal drug activity, in violation of Article I, section 9, of the Oregon Constitution. We conclude that the court erred in denying defendant's suppression motion, because the criminal drug investigation was not supported by reasonable suspicion. All evidence discovered as a result of that investigation, including derivative evidence discovered when defendant's phone was seized and searched, was inadmissible. Accordingly, we reverse and remand.

We review the trial court's ruling denying defendant's motion to suppress for errors of law. *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). In doing so, we are bound by the court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Where the court did not make express findings, and there is evidence from which the court could have found a fact in more than one way, we presume that the court decided the facts consistently with its ultimate conclusion. *Id.* We summarize the facts in accordance with those standards.

---

[1] Defendant also assigns error to the trial court's denial of his motion to suppress evidence obtained from the warrantless seizure and warranted search of his phone, events that would not have occurred but for the initial traffic stop and drug investigation. Our resolution of defendant's first assignment obviates the need to substantively address those additional assignments because we conclude that all evidence discovered as a result of the unlawful drug investigation was inadmissible, including evidence discovered on defendant's phone.

        In November 2017, defendant reported to the
La Grande Police Department that he and several of his
friends had been the victims of a series of robberies. For
reasons that are not clear on this record, police doubted the
veracity of those reports. The department enlisted the help
of the Union County Sheriff's Office, who conducted a sur-
veillance operation targeting defendant's house. Specifically,
Detectives McKaig and Sutten surveilled defendant's house
over the course of a two-week period, watching the house at
night for at most six hours at a time. McKaig testified as to
his observations:

> "So as we watched the residence, we noticed traffic com-
> ing and going, meaning individuals showing up, arriving,
> and whether they were staying quite short durations of
> time, which is consistent with what we know from surveil-
> lance to be consistent with drug activity. People come, they
> show up, and they go. And more specifically, the people that
> were coming and going were people that we knew to be in
> the drug world or the drug culture of Union County."

McKaig testified that a "known drug user" was

> "[s]omeone that we've either have knowledge specific,
> co-obrative [*sic*] knowledge that we can corroborate either
> ourselves, or that they've previously been convicted of drug
> crimes. And whether or not—it doesn't—I would say where
> they've been convicted of crimes, but that doesn't mean
> that that is the say all for us in the drug task force. If we
> have specific knowledge that we were able to corroborate or
> we've watched them buy drugs, or we've purchased drugs
> from them with a confidential informant, that's how we
> know they're a drug user."

        Later in December of that year, McKaig and Sutten
were conducting unrelated surveillance at around 7:00 p.m.
when they happened to recognize defendant driving a vehi-
cle that was headed out of town on Interstate 84. The detec-
tives left their position and began following defendant on
the interstate, staying about a mile behind him to avoid
detection.[2] The detectives were in plain clothes and were

---

[2] McKaig offered two reasons for their decision to tail defendant. McKaig
testified that they started following defendant because they knew his driver's
license was suspended, but also because they wanted to further surveil him.
Specifically, McKaig wanted to "see exactly where he was going and if he was
willing to—or going to meet up with somebody outside of town."

travelling in an unmarked police car. After traveling about five miles, defendant left the interstate and pulled into the parking lot of a state park. The detectives did not notice any other vehicles in that parking lot. The detectives continued past the exit, turned around, and "made a position that we could still see if another vehicle showed up, or lights at least if—if they were down there meeting somebody, in hopes of maybe identifying who they may be." However, no other vehicles arrived at the parking lot, and within a "couple minutes, tops," defendant pulled back onto the interstate in his original direction of travel. The detectives continued following him, observed several traffic violations, and initiated a traffic stop.

Both detectives believed that defendant's brief interstate exit and reentrance was a "heat check," or a maneuver designed to "avoid law enforcement detection or to discover law enforcement." When asked to explain what he meant by "heat check," McKaig testified that,

"when we're following individuals that are involved in the drug community—specifically, our small community, we have—the vehicle that we were in at that time, it—we've had that vehicle for 12 years and we've—we've been known in that vehicle. Like we—we leave our office and everyone knows that we've left our office at that time. So what happens more often than not with us, is we'll start to drive behind somebody, trying to stay back, but they either see us back there and they'll start to turn corners and let it be known that they know we're there.

"So—or if they don't know if we're there, it's just a strategy of a drug user or dealer that may have something on them to avoid law enforcement detection or to discover law enforcement; so they will take an exit or take a turn on a block and loop around behind the people that were behind them. If they look in their rearview mirror and suspect a car, they're going to loop around that person to see if the car makes the same turns they do."

Upon initiating the traffic stop, McKaig approached defendant's window, advised him that he had been stopped for certain traffic violations, and requested his license, insurance, and registration. McKaig testified that, at that time, he observed certain "drug indicators." First, McKaig

testified that he looked in the windows and observed "miscellaneous items" but "no luggage or anything like that." Second, defendant appeared to be extremely nervous. Specifically, McKaig observed that defendant was "having stomach tremors,"[3] smoking cigarettes, and "not making eye contact." While McKaig acknowledged that most people "get nervous when they're stopped by police," he believed that defendant's nervousness was "elevated" beyond the norm. At that point, McKaig returned to his vehicle, where he ran a record check of defendant and his passenger. Those checks confirmed that defendant's driving privileges were suspended. However, the detectives did not initiate writing any citations. McKaig returned to defendant's window and asked defendant about his travel plans.

Defendant responded that he and his passenger were headed to Wildhorse Casino in Umatilla County, which the officer believed to be a common location for drug deals in that area. Specifically, McKaig testified that,

> "here in Union County, I would—I would surmise that 99 percent of our illegal narcotics come from Umatilla County. It's kind of the mecca of Eastern Oregon's drug culture and most of the dealers are from there; so most all of our drug users and/or dealers will travel to Umatilla County, specifically Wildhorse.
>
> "And the reason they go to Wildhorse is, one, it's a really busy casino and truck plaza. But, two, it's on a reservation in which most law enforcement is not there.
>
> "And I've—we've had numerous investigations where that's where the meet spot is, is Wildhorse Resort and Casino."

Defendant indicated he planned to spend the night at the casino, which McKaig found suspicious because defendant did not have any luggage visible in the vehicle. McKaig asked defendant who he was going to meet at the casino, but defendant did not answer. Around that time, Sutten told McKaig that he had observed small rolls of aluminum foil in defendant's car, which McKaig testified are used for pill or

---

[3] McKaig elaborated that there is an "elevated level of nervousness, when you can actually see the heartbeat in someone's neck or their stomach breathing is tremored and it shakes as they breathe."

heroin packaging and "to smoke or take hits off of the aluminum foil." McKaig asked defendant if he had any drugs or weapons in the car. Defendant denied having those items, but McKaig "noticed a behavioral change when I asked specifically about heroin and—and meth." McKaig asked defendant if he thought a drug-detection dog would alert on his car, to which defendant responded, "It shouldn't." McKaig found that answer suspicious because it was not a definitive "no."

The detectives radioed to the Oregon State Police and requested their drug-detection dog. It took "a matter of minutes" for the dog to arrive, during which time defendant used his cell phone to call his girlfriend to secure a ride and the transport of his vehicle. The dog alerted and the detectives searched defendant, his passenger, and his vehicle.[4] A scale, "snort tubes," and drug residue were found in the car, and $611 in cash was found on defendant.[5] Finally, the detectives seized defendant's phone, because McKaig thought there was probable cause to believe that the phone would contain evidence of drug-related communications, and because McKaig thought that exigent circumstances necessitated a warrantless seizure because the evidence could be easily destroyed. Defendant was not cited or arrested and was left on the side of the road with his vehicle. Subsequently, the detectives obtained a search warrant to search defendant's phone for certain specified evidence of drug crimes from the previous 45 days. Based on the discovery of evidence on that cell phone, defendant was charged with a single count of conspiracy to deliver oxycodone.

In advance of trial, defendant moved to suppress the "stop, search, and seizure of the Defendant and his property, as well as the search warrant and all fruits thereof." As relevant to our analysis on appeal, defendant argued that the detectives unlawfully extended the traffic stop and began

---

[4] McKaig testified that "we had probable cause to search the vehicle based on the K-9 sniff." That sniff was conducted when the passenger, later found in possession of oxycodone, was in the vehicle. Defendant does not challenge the reliability of the dog sniff on appeal.

[5] Drugs and a handgun were also found on the passenger.

a criminal investigation, absent an "unavoidable lull"[6] or reasonable suspicion of drug activity, when they questioned defendant about his travel plans.[7] The state made only one argument in response: that the extension of the stop was supported by reasonable suspicion. The state highlighted (1) the detectives' observations at defendant's home weeks earlier, when they had witnessed known drug users visiting for short intervals; (2) defendant's behavior of briefly leaving the interstate, believed to be a "heat check"; (3) defendant's nervous demeanor, exhibited by lack of eye contact, stomach tremors, and smoking; and (4) the fact that defendant had no luggage. The state also argued three additional factors that McKaig did not learn until after he had asked defendant where he was headed: defendant's answer that he was headed to the Wildhorse Casino, defendant's response when asked if he had drugs in the car, and Sutten's observation that there were aluminum foil rolls in the car. The state argued that "there was reasonable suspicion to extend the stop. There was reasonable suspicion to call the dog[,]" and "[the detectives] had reasonable suspicion, which is all that's required to get a drug dog out there." The state never directly responded to defendant's argument that the stop was extended into a criminal drug investigation at an earlier point, when McKaig asked defendant where he was going.

      The trial court denied defendant's suppression motion. The court concluded that the detectives possessed

---

[6] At the time of defendant's arguments in the trial court, as well as his opening brief on appeal, Oregon followed the "unavoidable lull" doctrine, which permitted officers to ask investigatory questions unrelated to the purpose of a traffic stop as long as those questions did not delay the processing of a citation or extend the duration of the stop. *State v. Arreola-Botello*, 365 Or 695, 705, 451 P3d 939 (2019). However, in *Arreola-Botello*, the Supreme Court determined that the unavoidable-lull doctrine did not comport with Article I, section 9. It held that, "for the purposes of Article I, section 9, all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations. Accordingly, an officer is limited to investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification." *Id.* at 712.

[7] Defendant offered the court three arguments for when the stop was extended into a criminal investigation: first, when the detectives initiated the traffic stop; in the alternative, when the detectives asked defendant about his travel plans; and lastly, when the detectives requested the drug-detection dog. Defendant only reiterates the second argument on appeal.

reasonable suspicion of drug activity when they extended the traffic stop into a criminal investigation. The court went through the factors it considered in its analysis. First, the court concluded that the detectives' earlier surveillance of defendant's house supported a reasonable belief and inference "that a drug deal was going on" and that defendant was "involved in the drug trade." Second, the court considered the purported "heat check," which the court found was "suspicious activity" that "[t]he average driver doesn't do *** to try to avoid somebody. People involved in the drug trade, do that." Next the court considered the foil rolls that Sutten observed in defendant's car, because "it's highly unusual to have little packet-sized pieces of foil in a car loose around, more than one. But not if drugs are involved. It would be very typical[.]" Finally, the court also considered defendant's response that he was headed to the Wildhorse Casino, "a place where drug users and dealers meet up to bring drugs back *** to Union County." Considering the above factors in totality, the court concluded that "at that point [McKaig] had reasonable suspicion that there may, in fact, be drugs in this car, or indications of drug dealing in the car." The court made no mention of several factors that the state had raised in support of its reasonable suspicion arguments: defendant's lack of luggage but purported overnight trip plans, his extreme nervousness, and his responses when asked about drugs.

Following the trial court's ruling, defendant entered a conditional guilty plea, reserving the right to appeal the court's denial of his motion to suppress. This timely appeal resulted.

On appeal, defendant assigns error to the trial court's denial of his motion to suppress evidence. Defendant reiterates his argument that McKaig unlawfully extended the traffic stop and began a criminal investigation, absent reasonable suspicion of drug activity, when he questioned defendant about his travel plans. As a result, defendant argues, all evidence obtained as a result of that unlawful seizure—here, evidence discovered when defendant, his car, and his phone were subsequently searched—must be suppressed.

In response, the state submits three separate arguments. First, the state argues that McKaig's question about defendant's travel plans was related to the traffic stop and defendant's suspended driving privileges, and thus did not extend the stop. Second, the state argues that, even if the travel question was unrelated to the traffic stop, the resulting extension was nevertheless supported by reasonable suspicion of drug activity. Third, the state argues that, even if the travel question was impermissible, suppression is not warranted because the latter investigation and discovery of evidence was primarily the result of Sutten's observation of the aluminum foil rolls, not defendant's answer to the travel question. In reply, defendant asserts that the state failed to preserve its first and third arguments in the trial court below and that neither argument is appropriate under the "right for the wrong reason" doctrine.

We turn to the law that applies to this traffic stop and resulting criminal drug investigation. Article I, section 9, protects individuals against unreasonable searches and seizures. When an officer has lawfully stopped a person for a noncriminal traffic infraction, that officer may only make those "investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification." *State v. Arreola-Botello*, 365 Or 695, 712, 451 P3d 939 (2019). Determining a person's identity, issuing a citation, and verifying driving privileges are all reasonably related to the purpose of a traffic stop, so long as those activities are not unreasonably lengthy. *State v. Watson*, 353 Or 768, 782, 305 P3d 94 (2013). An officer may expand a traffic stop into a criminal investigation if that officer has reasonable suspicion of criminal activity. *State v. Huffman*, 274 Or App 308, 312, 360 P3d 707 (2015), *rev den*, 358 Or 550 (2016). Reasonable suspicion exists when an officer subjectively believes that the person has committed or is about to commit a specific crime or type of crime, and that belief is objectively reasonable in light of the totality of the circumstances known to the officer at the time of the stop. *Maciel-Figueroa*, 361 Or at 182. An officer can draw on his or her training and experience to make reasonable inferences under the circumstances, but "training and experience alone are not an adequate substitute for objectively

observable facts." *State v. Oller*, 277 Or App 529, 534, 371 P3d 1268 (2016), *rev den*, 361 Or 803 (2017). "Reasonable suspicion does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." *State v. Dampier*, 244 Or App 547, 551, 260 P3d 730 (2011) (internal quotation marks omitted).

We first address the state's argument that McKaig's travel plan question was reasonably related to the purpose of the traffic stop. On appeal, the state argues that McKaig's question as to where defendant was headed was permitted "to form a plan for ensuring both that defendant was not likely to re-offend as soon as the encounter ended and that the vehicle was not left on the side of the freeway." For example, "by asking about a stopped driver's travel plans, the officer can determine whether the driver's intended destination is close enough that perhaps the driver can be allowed to drive off the freeway to a location where his vehicle can more safely be left to wait for a licensed driver to retrieve it."

Whatever the merits of that argument, the state failed to raise it in the trial court. In both a written response to defendant's motion to suppress and oral arguments in the subsequent suppression hearing, the state offered no argument that the trial court should view McKaig's travel question as reasonably related to the initial traffic stop. Further, neither detective testified that the travel question was related to the traffic stop, or provided facts from which that conclusion could be inferred. Rather, their discussion of the travel question framed it, and its answer, within the reasonable suspicion inquiry—describing the Wildhorse Casino as a common drug deal spot and assigning suspicion to defendant's claimed overnight plans because he lacked visible luggage. Unsurprisingly, the court's ruling denying defendant's motion made no mention of the travel question outside of the role its answer played in the reasonable suspicion analysis.

We conclude that the record could have developed differently had the state's argument been raised in the trial court. The parties could have elicited testimony from McKaig about his purpose when he asked defendant about his travel

plans, a topic that was not explored on this record but which is highly relevant to whether the travel question was reasonably related to the traffic investigation. *See, e.g.*, *Watson*, 353 Or at 782-83 (considering officer's purpose and motivations in analysis of whether investigatory actions were reasonably related to traffic stop). Had McKaig asserted that he asked the travel question to help defendant "form a plan" for getting himself and his vehicle off the interstate legally, defendant could have challenged that testimony via cross-examination. Because the record could have developed differently had the state's argument been raised in the trial court, we decline to consider that argument for the first time on appeal. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (explaining that affirmance on an alternative basis not raised in the trial court as "right for the wrong reason" requires that the record be materially the same as what would have developed had the alternative basis been raised below).

We next consider whether McKaig had reasonable suspicion to transform the initial traffic stop into a criminal drug investigation. Although the trial court made no express factual findings as to the subjective component of the reasonable suspicion standard, we presume that the court implicitly found that McKaig indeed believed defendant was engaged in criminal drug activity. As a result, we consider only whether that belief was objectively reasonable, based on the totality of the circumstances known to McKaig when he extended the stop.

As a preliminary matter, we must clarify *when* McKaig extended the initial traffic stop into a criminal investigation. Defendant asserts on appeal that the stop was extended once McKaig had obtained defendant's documents, ran the necessary checks, and determined defendant's driving privileges were suspended, yet, rather than writing a traffic citation or concluding the stop, proceeded to ask defendant about his travel plans. However, we note that the trial court concluded that the stop was extended with reasonable suspicion at a later point, when McKaig asked defendant whether he had drugs or weapons and requested the drug-detection dog. We acknowledge that proceedings in the trial court occurred before the Supreme Court's ruling

in *Arreola-Botello*, which held that all investigative inquiries during a traffic stop are subject to subject-matter limitations and, if unrelated to the stop, require an independent constitutional justification. 365 Or at 712. Suffice it to say, we readily conclude that McKaig expanded the traffic stop into a criminal drug investigation when he asked defendant where he was headed as part of his criminal investigation, rather than to determine how to proceed with the stop or process any traffic citation. McKaig's question in that context was not reasonably related to the purposes of the traffic stop.

Thus, we consider the totality of the circumstances known to McKaig at the time that he asked defendant where he was headed. To review, those circumstances were that (1) some weeks earlier, McKaig had surveilled defendant's home on several nights and observed known drug users visiting defendant's home for short periods, activity McKaig considered to be consistent with drug dealing; (2) when McKaig was following defendant on the interstate that night from a distance of about a mile away, McKaig observed defendant pull off the interstate to a seemingly empty park parking lot and leave again within a couple minutes, behavior that McKaig believed was consistent with a "heat check" maneuver to avoid or discover law enforcement; (3) once defendant was stopped, McKaig did not observe any luggage in the vehicle; and (4) defendant appeared to be extremely nervous, as exhibited by a lack of eye contact, stomach tremors, and smoking.

First, McKaig's observations while surveilling defendant's home are insufficient alone to establish reasonable suspicion that defendant was committing a drug crime when McKaig happened upon defendant driving out of town some weeks later. We have routinely concluded that lawful behavior that is nevertheless consistent with buying or selling drugs, such as a defendant's short visit to a suspected drug house, does not amount to reasonable suspicion that the defendant committed a drug crime without more. *See State v. Bertsch*, 251 Or App 128, 133-34, 284 P3d 502 (2012) (no reasonable suspicion where the defendant was observed visiting an apartment suspected of drug activity, left the apartment after "only a short time," and was accompanied

by "a person who was known to associate with drug users and dealers"); *State v. Broughton*, 221 Or App 580, 584, 193 P3d 978 (2008), *rev dismissed*, 348 Or 415 (2010) (no reasonable suspicion where the defendant visited a suspected drug house for "no longer than a minute"); *State v. Loud*, 149 Or App 250, 254, 942 P2d 814, *rev den*, 326 Or 58 (1997) (no reasonable suspicion where the defendant had a brief visit with a suspected drug dealer in an area known for drug sales); *cf. State v. Barber*, 279 Or App 84, 94-95, 379 P3d 651 (2016) (reasonable suspicion where the defendant left an apartment detectives were monitoring for heroin dealing, sat in his car and engaged in what detectives called possible drug activity, drove into the parking lot of a motel known for drug activity, failed to immediately pull over, and drove slowly while his passenger fumbled under the seat). Admittedly, here, defendant was not a visitor but instead the resident of the suspected drug house. Although defendant's repeated receipt of short visits from known drug users at his house might allow for a slightly stronger inference of criminal drug activity than the facts presented in *Bertsch*, *Broughton*, or *Loud*, those observations offer, at most, one data point in the wider totality of the circumstances. Even assuming that those facts could support a reasonable suspicion that defendant was engaged in criminal drug activity when defendant's house was observed, they cannot support a reasonable suspicion that defendant was engaged in that activity *when traveling in his car several weeks later.*

The state posits that defendant's supposed "heat check" maneuver on the interstate combines with the detectives' earlier observations at defendant's house to create reasonable suspicion that defendant was presently engaged in drug trafficking or related crimes when his car was stopped. We do not agree, for several reasons. First, as noted, the several-week gap between the observations at defendant's house and defendant's actions on the night he was stopped makes any connection between the two strained. Further, McKaig offered no testimony connecting his observations at defendant's home to the later purported "heat check" despite that temporal gap. Had there been evidence that defendant met those short-term visitors in his car, for instance, or that defendant's passenger was one of those visitors, there might

have been some reason to consider the two observations connected. On this record, however, the only connection between the two is defendant himself. Second, the fact that defendant briefly stopped in a state-park parking lot while traveling on a freeway is not particularly suspicious on its own, or in combination with the previous observations at defendant's home. There are a variety of legitimate reasons why a driver may choose to briefly leave the interstate and stop in a parking lot that is open to the public before continuing on his original path of travel. Even assuming that briefly leaving the freeway was an intentional and purposeful "heat check," an individual's choice to take legal measures to avoid police interaction is not indicative of any particular criminal activity. *See, e.g.*, *State v. Martin*, 260 Or App 461, 472-73, 317 P3d 408 (2014) ("Evidence that a person is in a high-crime area, is engaged in ambiguous conduct, and appears to want to avoid police observation does not give rise to reasonable suspicion to stop the person.").

Having concluded that the observations at defendant's home and defendant's purported "heat check" do not support reasonable suspicion of criminal drug activity either individually or collectively, the remaining factors known to McKaig when he began investigating defendant for drugs add little to the analysis. The fact that defendant was not carrying any visible luggage is entirely meaningless without the added context of his later statements that he was headed to the Wildhorse Casino and planned to stay the night there. And, as we explained earlier, defendant's travel plans were not known until McKaig had already begun investigating defendant for drug crimes. Finally, we give little weight to McKaig's observations that, when he stopped defendant, defendant would not make eye contact, was having stomach tremors, and was smoking. A defendant's nervousness carries little weight in the reasonable suspicion analysis. *See, e.g.*, *State v. Taylor*, 308 Or App 61, 71, 479 P3d 620 (2020) ("Without a link between defendant's nervousness and any fact supporting objectively reasonable suspicion of drug possession, nervousness, even extreme nervousness, is relatively meaningless to our reasonable suspicion analysis."). Considering the totality of the information known to McKaig at the time he extended the traffic

stop into a criminal drug investigation, he did not possess reasonable suspicion that defendant was presently engaged in drug trafficking or related crimes.

We turn to the state's final argument that, even if McKaig began a drug investigation absent reasonable suspicion when he asked defendant about his travel plans, any evidence that the detectives ultimately uncovered was not a product of that question. The state's argument is essentially that the travel destination question was not a but-for cause of the later discovery of evidence because Sutten's observation of the visible foil pieces would have led to the same discoveries anyway.

"When the state has obtained evidence following the violation of a defendant's rights under Article I, section 9, we presume 'that the evidence was tainted by the violation and must be suppressed.'" *State v. Benning*, 273 Or App 183, 194, 359 P3d 357 (2015) (quoting *State v. Jackson*, 268 Or App 139, 151, 342 P3d 119 (2014)). The state may rebut that presumption by proving that the unlawful conduct was "independent of, or only tenuously related to the disputed evidence." *Benning*, 273 Or App at 194 (internal quotation marks omitted).

Whatever the merits of the state's attenuation argument, the state failed to raise it in the trial court. In written and oral arguments opposing defendant's motion to suppress, the state offered one argument in response to defendant's claim that the drug investigation was unlawful: that it was lawful because it was supported by reasonable suspicion of criminal drug activity. The state made no alternative arguments. Had the state raised such an attenuation argument below, a different record would have likely developed. Importantly, the parties could have elicited testimony from Sutten describing the foil rolls in detail and placing his conversation with McKaig about the rolls at a specific point in time. The state's attenuation argument assumes that McKaig had grounds to lawfully begin a drug investigation once he knew about the foil rolls, regardless of the information about defendant's travel plans, but the trial court did not evaluate that question. Thus, we decline to consider that argument for the first time on appeal. *See*

*State v. Mullens*, 276 Or App 217, 219, 366 P3d 798 (2016) ("[A]s we have previously held, we will not consider the state's lack-of-exploitation argument as an alternative basis for affirmance where that argument was not made below and the record may have developed differently had it been raised." (Citation omitted.)). Because the state failed to meet its burden to rebut the presumption that evidence discovered subsequent to a constitutional violation is tainted by that violation, we conclude that the evidence in this case must be suppressed.

In sum, the trial court erred in denying defendant's motion to suppress because McKaig did not have reasonable suspicion to convert the initial traffic stop into a criminal drug investigation when he asked defendant where he was headed, a question which was not, on this record, reasonably related to the initial traffic stop. As a result, all evidence subsequently discovered as a result of that drug investigation must be suppressed, including evidence discovered when defendant's phone was seized and searched. Accordingly, we reverse and remand this case to the trial court to allow defendant to withdraw his conditional guilty plea.[8]

Reversed and remanded.

---

[8] ORS 135.335(3) permits a defendant to withdraw and rescind a conditional plea "if one of the premises on which the parties entered into the plea agreement is no longer valid." *State v. Tannehill*, 341 Or 205, 212, 141 P3d 584 (2006). Because defendant's appeal follows a conditional guilty plea, we do not need to address whether the trial court's error was prejudicial. *State v. Leach*, 294 Or App 639, 646, 432 P3d 310 (2018).