Argued and submitted March 10, decision of Court of Appeals and judgment of circuit court affirmed October 13, 2022

STATE OF OREGON,
*Respondent on Review,*

*v.*

DARIUS LESHAWN THOMPSON,
aka Darius Lawshawn Thompson,
*Petitioner on Review.*

(CC 14CR29087) (CA A160396) (SC S068639)

518 P3d 923

Petitioner moved to suppress evidence derived from the retention of his cell phone, which was held for five days without a warrant. The trial court denied the motion, a jury convicted defendant of first-degree robbery and other crimes, and the Court of Appeals affirmed. *Held*: (1) The warrantless retention of defendant's phone for five days was unreasonable in the circumstances of this case and violated Article I, section 9, of the Oregon Constitution; (2) defendant adequately raised and preserved his objection to certain pieces of evidence in the trial court and the Court of Appeals; and (3) the admission of the evidence that should have been suppressed did not prejudice defendant, so the trial court's error in admitting that evidence was harmless.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

On review from the Court of Appeals.*

Anne Fujita Munsey, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, and Garrett, Justices, and Baldwin, Senior Judge, Justice pro tempore.**

_____

* On appeal from Multnomah County Circuit Court, David F. Rees, Judge. 308 Or App 729, 481 P3d 921 (2021).

** DeHoog, J., did not participate in the consideration or decision of this case.

BALMER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

## BALMER, J.

In this criminal case, defendant robbed someone with a knife, and the victim shot defendant. Defendant sought treatment in a hospital, where police officers questioned him. An officer seized defendant's cell phone as likely containing evidence of the shooting and other crimes. The officer did so without a warrant, fearing that, if he did not seize the phone, defendant could otherwise destroy the phone or its contents. Police kept the phone for five days before applying for a warrant to seize and search the phone. Once they had the warrant, police searched the phone and found records of calls and messages related to the robbery and shooting. They then used that information in questioning defendant, eliciting statements that defendant argues were incriminating. Before trial, defendant moved to suppress the phone and all derivative evidence, and the trial court denied the motion. A jury found defendant guilty of first-degree robbery, among other crimes, and the Court of Appeals affirmed the resulting conviction. *State v. Thompson*, 308 Or App 729, 481 P3d 921 (2021).

We allowed review, limited to the issues raised by the motion to suppress, including preservation questions at trial and on appeal. We first accept—and agree with—the state's concession that the Court of Appeals erred in holding that it did not need to consider three statements that defendant claims should have been suppressed because he identified them only in his reply brief in that court, and not in his opening brief. *Id.* at 737. We then conclude, for the reasons explained below, that keeping defendant's phone for five days without a warrant was unreasonable in the circumstances presented here and was, therefore, unlawful. We also conclude that defendant adequately raised and preserved his objection to the admission of evidence derived from the phone's unlawful seizure, and that the trial court erred in denying defendant's motion to suppress. Finally, we evaluate whether the admission of evidence that should have been suppressed prejudiced defendant, and we conclude that it did not. We therefore affirm defendant's conviction.

## I.  BACKGROUND

We present the facts as found by the trial court, because, in reviewing the denial of a motion to suppress, we "are bound by the court's factual findings if there is constitutionally sufficient evidence to support them." *State v. DeJong*, 368 Or 640, 643, 497 P3d 710 (2021). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

Defendant used a knife to rob another person. He was aided by an accomplice, Beacock, also known as "Pree." At some point during the robbery, the victim drew a gun and shot defendant in the leg.

Defendant went to a hospital for treatment of his gunshot wound. When he arrived, he presented false identification. Because defendant had been shot, hospital staff contacted the police. Officer Robertson responded, along with other officers. Robertson recognized defendant from prior encounters and realized that defendant had not given his true name to the hospital. The local dispatch center had received no other reports of persons being admitted to a hospital in the area with a gunshot wound that night.

Robertson questioned defendant briefly and asked defendant about the wound. Defendant claimed that he had been the victim of a drive-by shooting. Robertson took defendant's cell phone, believing it would contain evidence related to the shooting and to the possible crime of identity theft (based on defendant's presentation of false identification when he was admitted to the hospital). Robertson was concerned that, if he did not seize the phone, defendant would destroy the phone or erase its data. Robertson did not have a warrant to seize the phone. He did not search the phone at that time.

Over the next five days, police investigated the robbery and shooting, including by locating and interviewing the victim. On the fifth day, Robertson applied for and obtained

a search warrant for the phone's contents. Robertson then searched defendant's phone and found, among other things, records of calls between defendant and Pree, including five calls on the night of the shooting, and one text message from Pree to defendant early the following morning that said, "Hey bro, you all right?" The police arrested defendant the day after searching the phone.

Following defendant's arrest, Robertson and another officer interviewed defendant. At first, defendant repeated his claim that he had been the victim of a drive-by shooting and claimed that he had never spoken to Pree on the phone and would not recognize a picture of Pree. After more questioning, however, defendant changed his story and admitted to being present during the robbery. He claimed that Pree, not defendant, had attempted to rob the victim and that Pree, not defendant, had wielded the knife. In this version of the story, defendant had been "a bystander" and had "r[u]n off," and Pree had "just wanted [defendant] there for *** protection."

A few minutes later in the interview, Robertson mentioned that the police had searched defendant's phone. Robertson suggested that the records of calls and texts between defendant and Pree contradicted defendant's earlier claim that he had never talked with Pree on the phone. After the phone was brought up, the interview continued, and defendant and Robertson had several exchanges which defendant now argues are prejudicial and which we discuss below.

Defendant was indicted on multiple charges, including attempted aggravated murder, robbery, assault, unlawful use of a weapon, and identity theft. Before trial, defendant moved to suppress "the seizure of defendant's cell phone, as well as all derivative evidence." Defendant argued that Robertson did not have probable cause to seize the phone and, furthermore, that no exigency justified keeping the phone for five days. In defendant's view, even if the phone's initial seizure were lawful, the state was permitted to retain the phone for only the time it would have taken to get a search warrant—six to 10 hours, according to Robertson.

The state responded that both the initial seizure and the retention of the phone for five days were lawful. It contended that Robertson did have probable cause to believe that the phone contained evidence relevant to both the shooting and the identity theft, and that exigencies justified the seizure and retention because the phone or its data could be destroyed if it were not seized and retained.

The trial court agreed with the state and denied defendant's motion to suppress. The court concluded that Robertson had probable cause to seize the phone, at least as to the crime of identity theft, and possibly as to the shooting as well, and that the five-day retention was justified because it was part of "an active, ongoing investigation."

Later during the same hearing, defendant argued a series of motions *in limine* seeking to exclude parts of a video recording of defendant's police interview, which the state wanted to play for the jury. Among the parts of the interview defendant sought to exclude, defendant identified certain comments he made after Robertson had referred to the contents of defendant's phone, and that we describe in detail below. Even though the court had already denied his motion to suppress, defendant argued, "for the purposes of appeal," that that part of the interview was implicated in the motion to suppress. If Robertson had not been able to confront defendant about what was on his phone, defendant explained, "the interview would have flowed differently," and specific statements in the interview following that moment were therefore derivative of the cell phone's seizure. The court expressly recognized that defendant was "preserving the argument with respect to [the court's] ruling on the phone with respect to those statements as well." The state did not object or disagree with the trial court's characterization that defendant was preserving the argument.

The case proceeded to trial. The jury found defendant not guilty of attempted aggravated murder but convicted him of first- and second-degree robbery, second-degree assault, unlawful use of a weapon, and identity theft.

Defendant appealed, assigning error to the trial court's denial of his motion to suppress, along with another ruling. Among other things, defendant reiterated his argument

that the seizure of the phone affected the subsequent police interview. The state argued that any error was harmless, and, in reply, defendant identified three statements from the interview that he argued were prejudicial and were derivative of the unlawful seizure because they occurred after police told defendant about the call logs that they had found on his phone during the search.

The Court of Appeals affirmed in a split decision. *Thompson*, 308 Or App at 741. The majority assumed without deciding that the trial court had erred in denying defendant's motion to suppress, and it agreed with the state that any error in admitting evidence derived from the seizure of the phone was harmless. *Id.* at 735. In its harmlessness analysis, the majority declined to consider the three statements that defendant had identified in his reply brief, further noting that its conclusion would have been the same even if it had it considered the latter statements. *Id.* at 737-38.

The dissent disagreed, explaining that, in its view, retaining defendant's phone for five days was not justified by an exigency, and the state should have sought a warrant sooner than it did. *Id.* at 745-47 (Egan, C.J., concurring in part and dissenting in part). The dissent also concluded that the statements that defendant had identified in his reply brief should have been considered as part of the harmlessness analysis, and it disagreed with the majority's determination that the error was harmless. *Id.* at 743-45.

As noted, we allowed review of the various questions related to the motion to suppress.

## II.  ANALYSIS

As a preliminary matter, we address the Court of Appeals' holding that, because defendant identified certain statements that he claims should have been suppressed only in his reply brief in that court—and not in his opening brief—it did not need to consider those statements in deciding whether any trial court error was prejudicial. *Id.* at 737.

On review, the state concedes that that holding was error. The state agrees that, if defendant preserved his

claim as to the suppression of the entirety of the interview after Robertson confronted defendant with information derived from his phone—a separate issue that we discuss below—then "nothing prevented him from filing a reply that identified specific statements that constituted prejudice." We agree that ORAP 5.45 permits an appellant to use a reply brief to clarify arguments from their opening brief, particularly in response to specific arguments made in the answering brief.

We turn to the other issues related to the motion to suppress. "We review a trial court's denial of a motion to suppress for errors of law ***." *DeJong*, 368 Or at 643.

This case presents four related questions: (1) whether the police violated Article I, section 9, of the Oregon Constitution by seizing and retaining defendant's phone without a warrant, (2) whether the evidence that defendant sought to suppress derived from that seizure, (3) whether defendant adequately preserved his suppression argument with regard to certain statements that he made during the police interview, and (4) whether any error by the trial court was harmless. For the reasons explained below, we conclude that the five-day retention of defendant's phone was unlawful, that part of defendant's police interview derived from that unlawful seizure, and that defendant adequately preserved his claim of error as to his statements in the police interview after the officers had informed defendant of the call logs and texts found in the search of his phone. We further conclude, however, that the trial court's error in denying the motion to suppress was harmless.

A.  *Whether the Retention of Defendant's Cell Phone Was an Unlawful Seizure*

Article I, section 9, of the Oregon Constitution protects individuals against unreasonable searches and seizures:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

As relevant here, that provision protects the rights of individuals to be free from "unreasonable search, or seizure." Searches are distinct from seizures, although they sometimes occur together. "A search occurs when the government invades an individual's privacy interest, whereas a seizure occurs when there is a significant interference, even a temporary one, with a person's possessory or ownership interests in the property." *State v. Barnthouse*, 360 Or 403, 413, 380 P3d 952 (2016) (citation and internal quotation marks omitted). Keeping property in police custody is a form of continuing seizure. *State v. Owens*, 302 Or 196, 207, 729 P2d 524 (1986) ("The seizure of an article by the police and the retention of it (even temporarily) is a significant intrusion into a person's possessory interest in that 'effect.'").

As this court has explained, "[u]nder Article I, section 9, searches and seizures must be conducted pursuant to a warrant or one of the few specifically established and limited exceptions to the warrant requirement. Searches and seizures are distinct events requiring separate justifications." *State v. McCarthy*, 369 Or 129, 131, 501 P3d 478 (2021). Each search or seizure by the state, including continuing seizures, must be reasonable, as demonstrated by an accompanying warrant or by coming within an exception to the warrant requirement. If police search or seize something without a warrant, the state has the burden to prove that that search or seizure was valid under an exception to the warrant requirement. *State v. Unger*, 356 Or 59, 75, 333 P3d 1009 (2014); ORS 133.693(4) ("Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution.").

In this case, the relevant exception to the warrant requirement is the "exigent circumstances," or "exigency," exception. "Under that exception, police may conduct a warrantless seizure or search if they have probable cause and exigent circumstances exist. Exigent circumstances are circumstances where prompt responsive action by police officers is demanded." *McCarthy*, 369 Or at 142 (citation and internal quotation marks omitted).

Exceptions to the warrant requirement, such as the exigency exception, are limited in various ways, including in terms of scope and duration. "The scope of a warrant exception," for instance, "is limited by the purposes for that exception." *Id.* at 141-42; *see also State v. Stevens*, 311 Or 119, 130-31, 806 P2d 92 (1991) (a report of missing children justified a brief, targeted investigation of the house where police had probable cause to believe the children were located). Likewise, an exception "may not be used in ways that reach beyond the purposes of the particular exception." *State v. Fulmer*, 366 Or 224, 233, 460 P3d 486 (2020); *see also State v. Miller*, 300 Or 203, 229-30, 709 P2d 225 (1985) (explaining that an exigency that permitted entry into a room might not justify a search into closed cupboards or drawers).

The duration of a warrant exception also may be limited. This court has held that the exigency exception, for example, lasts only while the corresponding exigent circumstances last. *See McCarthy*, 369 Or at 178 (an exigency may justify initial seizure, but "the seizure itself may eliminate any exigency that would justify proceeding further without a warrant," such as, in that case, searching a car); *State v. Davis*, 295 Or 227, 239-40, 666 P2d 802 (1983) (exigent circumstance of someone being held inside a room by an armed person did not justify warrantless entry into the room after the person being held walked out the door); *State v. Quinn*, 290 Or 383, 392, 623 P2d 630 (1981), *overruled on other grounds by State v. Hall*, 339 Or 7, 115 P3d 908 (2005) (a deferred warrantless search of a vehicle "must be commenced as promptly after the seizure as is reasonable in the circumstances"). Additionally, the police may not create or prolong exigent circumstances by their own inaction or for their own convenience. *State v. Fondren*, 285 Or 361, 366-67, 591 P2d 1374, *cert den*, 444 US 834 (1979), *overruled on other grounds by State v. Brown*, 301 Or 268, 721 P2d 1357 (1986) (exigent circumstances did not exist when officer waited four hours after establishing probable cause to seize a parked automobile because an "officer cannot create exigent circumstances by his own inaction"); *Quinn*, 290 Or at 392 (a search that was delayed "for the convenience of the police and the owner of the stolen property" was not justified by the exigency exception).

In this case, Officer Robertson took defendant's phone and held it for five days before seeking and obtaining a warrant. Both taking and keeping the phone were warrantless seizures that each must have been both supported by probable cause and subject to a warrant exception. As to probable cause, Robertson testified that he thought that he had probable cause to believe that defendant's phone would have evidence of defendant's identity and evidence related to defendant's shooting. As to exigency, Robertson testified to his belief that, if he left the phone with defendant, defendant might destroy the phone or erase its data before Robertson could get a warrant and search the phone. In the officer's view, the potential destruction of evidence was an exigency that justified seizing (but not searching) the phone and holding it until a search warrant application could be processed. We assume without deciding that Robertson's initial seizure of the phone was supported by probable cause and justified by an exigency, and we focus instead on whether retaining the phone for five days before applying for a warrant was justified by an exigent circumstance.

In the state's view, the exigency exception applies in this case because, if the phone had been left with or returned to defendant, defendant could have destroyed the phone or altered its contents. As the state argues, exigent circumstances may include "situations where the delay caused by obtaining a warrant would likely lead to the loss of evidence." *McCarthy*, 369 Or at 142. But even in such a circumstance, police officers are not permitted to prolong the circumstance through their own decision not to seek a warrant. *See Fondren*, 285 Or at 366-67; *Quinn*, 290 Or at 392. By continuing to hold the phone without seeking a warrant to retain the phone and to search it, the police impermissibly prolonged the very circumstance that the state argues allowed them to retain the phone. Robertson testified that he could have applied for (and potentially received) a warrant in six to 10 hours after seizing the phone. Instead, he waited five days. By that time, the purported exigency was attributable only to Robertson's delay in seeking a warrant, and it no longer justified the continuing seizure. The state has not identified any exigency or other exception to the warrant requirement that might justify Robertson's

retention of the phone for five days without seeking a warrant.

*Fondren* offers a helpful comparison and supports our conclusion that the delay here was unlawful. The officer in that case obtained information that constituted probable cause to believe that marijuana was in a car owned by the defendant. 285 Or at 365. The officer received that information between 6:30 and 7:30 p.m., and he found the car at defendant's place of work in less than 45 minutes. The officer chose not to seek a warrant, although he testified that a warrant could have been applied for and obtained within an hour and a half to four hours. *Id.* at 366. At 11:30 p.m., four to five hours after the officer had probable cause, the officer had the defendant called out from his workplace to the car. The defendant refused to consent to a search of his car, and the officer had the car towed. In other words, the officer seized the car to prevent the loss of any evidence inside. The officer obtained a search warrant the next day, searched the car, found marijuana, and seized it. The defendant moved to suppress the marijuana, arguing that the seizure of the car was unlawful. *Id.* at 363.

As relevant here, the question in *Fondren* was whether seizing defendant's car was justified by exigent circumstances because the contraband was likely to disappear if the officer did not seize the car before seeking a warrant. This court observed that the officer had enough information to apply for a warrant more than four hours (the maximum time it would have taken to get a warrant) before the defendant was due to return to his car. The officer did not cite any other exigency justifying a delay in getting a warrant. As this court explained, "That the officer waited until 10:00 p.m. or thereafter to attempt to obtain a warrant and then decided there was insufficient time does not create exigent circumstances. \*\*\* The officer cannot create exigent circumstances by his own inaction." *Id.* at 366-67. This court concluded that the purported exigency did not justify the seizure and that the motion to suppress should have been granted.

Although the law applicable to the seizure of vehicles has changed since *Fondren* was decided, *see Brown*, 301

Or at 277, *overruled by McCarthy*, 369 Or at 177, *Fondren* still stands for the principle that police may not create—or extend—the circumstances that justify a temporary, warrantless search or seizure. In *Fondren*, as in this case, the relevant inaction was the decision not to apply for a warrant despite having the necessary information. In both cases, the exigency could have been avoided or made immaterial by applying for and potentially receiving a warrant. Although *Fondren* is not on all fours with this case, the state makes no attempt to distinguish *Fondren*, and, reasoning by analogy, we conclude here that the circumstances that justified the initial seizure of defendant's cellphone did not justify police in keeping it for five days. As we said in *State v. Watson*, 353 Or 768, 781, 305 P3d 94 (2013), regarding the seizure of a person, "both Oregon statutes and this court's Article I, section 9, case law require that law enforcement officers have a justification" for a temporary seizure as part of an investigation, and that "officer[s'] activities be reasonably related to that investigation and reasonably necessary to effectuate it." If the officers' activities "exceed those limits, then there must be an independent constitutional justification for those activities." *Id.*

The state also argues that, once police have lawfully seized evidence of an alleged crime, they may then hold that evidence indefinitely for use at trial, without a warrant. The state relies on cases in which, the state argues, this court implied that containers of illicit substances, once lawfully searched, may be held for use at trial: *State v. Heckathorne*, 347 Or 474, 223 P3d 1034 (2009); *Owens*, 302 Or 196; and *State v. Herbert*, 302 Or 237, 729 P2d 547 (1986).

The state's reliance on those cases is misplaced. In those cases, the evidence at issue was allegedly unlawful or controlled substances and their containers. *See Heckathorne*, 347 Or at 477 (anhydrous ammonia, a precursor substance used in methamphetamine production); *Owens*, 302 Or at 198 (unspecified controlled substances); *Herbert*, 302 Or at 239 (cocaine). Additionally, those cases focused on the legality of initial searches and seizures, not the state's ability to retain seized evidence for use at trial. Even so, to the extent that those cases did permit the police to hold property

without a warrant, they did so in part because the property at issue was contraband, and its possession by the defendants was illegal.

In this case, however, the evidence at issue was defendant's own phone—not stolen property or contraband—and it was, of course, lawful for defendant to possess the phone. Although the defendants in *Heckathorne*, *Owens*, and *Herbert* would not have been able to have their seized contraband returned to their possession, *see* ORS 133.643(3) (requiring that someone seeking the return of seized things must be lawfully entitled to possess those things), here, police could have returned defendant's phone. *Heckathorne*, *Owens*, and *Herbert* are distinguishable from this case and do not stand for the proposition that any property, once in police custody, may be retained indefinitely as evidence in the absence of a warrant.

The state raises the additional counterargument that, under Fourth Amendment case law, the five-day retention of defendant's phone was "reasonable" because, as Robertson testified, "[a] lot happened during that [five-day] period of time." The state essentially contends that the retention was permissible because police were diligently pursuing their investigation of the shooting and developing probable cause to search and seize other evidence in various locations, as well as the phone. The state emphasizes that "[t]he five-day delay before obtaining a warrant was not due to neglect, but, rather, as the trial court found, resulted from investigators' other obligations during an 'active, ongoing investigation.'"

That argument fails for two reasons. First, it is based on the state's premise that Fourth Amendment case law allows police to retain seized property for a "reasonable" time. Our conclusion above as to the validity of the seizure here flows, however, from Article I, section 9, of the state constitution, which, as we have consistently held, may be more restrictive of police activity than the federal constitution. *State v. Caraher*, 293 Or 741, 750-51, 653 P2d 942 (1982). And our cases do not countenance an open-ended reasonableness inquiry that balances law enforcement's investigative needs against an individual's property interests. Rather, our cases

make clear that police may justify temporary warrantless seizures only to the extent that those seizures are "reasonably necessary to effectuate" an investigation, and police activities that "exceed those limits [require] an independent constitutional justification." *Watson*, 353 Or at 781.

Second, even if we look to federal case law for guidance, an ongoing investigation, however diligently pursued, does not automatically toll the constitutional requirement that the seizure and retention of property be reasonable— especially the seizure and retention of property like phones, which, for many, are integral to everyday life and contain a wealth of personal information. *See Riley v. California*, 573 US 373, 396-97, 134 S Ct 2473, 189 L Ed 2d 430 (2014) (suggesting that phones now often contain more information than houses do). The state cites *United States v. Burgard*, 675 F3d 1029, 1035 (7th Cir), *cert den*, 568 US 852 (2012), which summarizes the principle well: "After seizing an item without a warrant, an officer must make it a priority to secure a search warrant that complies with the Fourth Amendment. This will entail diligent work to present a warrant application to the judicial officer at the earliest reasonable time."

In *Burgard*, the Seventh Circuit found that retaining a seized phone for six days without a warrant was reasonable, and the state urges us to come to the same conclusion here. But the circumstances in *Burgard* were different. In *Burgard*, the court detailed how the seizing officer worked toward getting a warrant during those six days. *Id.* at 1031. The process for getting a warrant in that case involved working with another officer, who was assigned to work part time with the FBI, and then collaborating with a federal prosecutor. The only delays attributed to events outside the warrant application process were delays due to an armed robbery in a nearby town, which the officer applying for the warrant had to respond to, and an intervening Saturday, during which the officer may have continued to work on the robbery or "may have taken that day off." *Id.* Thus, although some delay was attributable to intervening causes, the bulk of the delay was due to the complex warrant application process, and the intervening causes included an emergency that required immediate attention.

Here, by contrast, Robertson testified that he was working on other, not phone-related aspects of the investigation of this case for the bulk of the five days after he seized defendant's phone. Robertson did not testify that he, like the officer in *Burgard*, faced delays in attempting to acquire the warrant due to intervening emergencies, inefficiencies in the warrant process, or the need to coordinate the application with other law enforcement agencies. And although part of Robertson's investigation may have involved preparing other materials in support of the warrant that was ultimately issued—which included physical evidence and locations, in addition to defendant's phone—Robertson did not testify that those efforts were necessary to get a warrant to seize and search the phone. And even if the five-day delay here were due to inefficiencies in the warrant process, that alone would not necessarily excuse police from limiting their retention of seized property to a reasonable time as required by the Oregon Constitution. *See McCarthy*, 369 Or at 177 ("[L]aw enforcement agencies and courts cannot create exigent circumstances by failing to take reasonable steps to develop warrant processes that protect against the invasion of the rights of a citizen that results from an unnecessarily cumbersome warrant process." (Citation and internal quotation marks omitted.)). Thus, even if we were to apply the federal "reasonableness" standard proposed by the state, the five-day delay in seeking a warrant would not have met that standard.

In sum, we conclude that, under the facts of this case, retaining the phone for five days, when the police could have obtained a warrant in less than one, was not "reasonably necessary" to the investigation, *Watson*, 353 Or at 781, and violated Article I, section 9. To be clear, we do not hold that there is a specific time limit within which police must obtain a warrant in every case, or that there was such a precise deadline in this case. *Cf. Illinois v. McArthur*, 531 US 326, 331, 121 S Ct 946, 148 L Ed 2d 838 (2001) (declining to adopt a bright-line rule that a warrantless seizure is unreasonable under the Fourth Amendment). Rather, the continued seizure was justified only for the time that was reasonably necessary to obtain a warrant, and we conclude that the five-day delay was not reasonable under the circumstances here.

B.   *Whether the Evidence at Issue Derived from the Seizure*

Evidence that is obtained as the result of an unconstitutional act is generally suppressed. *State v. Arreola-Botello*, 365 Or 695, 714, 451 P3d 939 (2019). If the state gains information through an unlawful search or seizure in violation of Article I, section 9, the state may not take advantage of that information, which would be "an advantage that [it] would not have had had the police stayed within the bounds of the law." *Unger*, 356 Or at 74.

In this case, defendant sought to suppress "the seizure of defendant's cell phone, as well as all derivative evidence." Defendant acknowledges that his phone was searched pursuant to a warrant but contends that that search was tainted by the preceding, unlawful seizure. He asserts that his motion to suppress covered the phone itself, information and data obtained from the search of the phone, and other evidence derivative of the unlawfully obtained information. For analytical purposes, we distinguish between (1) evidence taken directly from the search of defendant's phone—such as information as to defendant's identity and text messages between defendant and Pree—as to which police had obtained a warrant, and (2) defendant's statements during his police interview made after Robertson referred to certain information found on the phone.

This court recently explained how we approach evidence obtained when unlawful police conduct leads to a warranted search:

> "[T]his court [has] adopted a burden-shifting framework that applies when a defendant challenges the admission of evidence obtained in a warranted search that is preceded by an illegality. Under that framework, the defendant has the initial burden to establish a minimal factual nexus between the illegality and the challenged evidence. If the defendant does so, the burden shifts to the state to establish that the challenged evidence was untainted by the illegality."

*DeJong*, 368 Or at 642 (citation omitted). We apply that framework in this case and evaluate whether defendant established a minimal factual nexus between the unlawful seizure and the challenged evidence.

As for the first category of evidence, information found within the phone itself, defendant argues that he established the minimal factual nexus by pointing out that, in Robertson's search warrant application, Robertson identified the phone by brand, color, and number, and described it as "currently being held in the Gresham Police [Department] Evidence division." That the phone was being held by the police, of course, was true only because the phone had been seized and retained despite the dissipation of the exigency that justified the initial seizure and for what we have just determined was an unreasonably long period of time. The state makes no argument that defendant did not establish a minimal factual nexus between the unlawful seizure of the phone and the evidence that it obtained from the phone.

This aspect of the case bears some resemblance to *State v. Johnson*, 335 Or 511, 73 P3d 282 (2003). In that case, the police unlawfully seized defendant's clothes as evidence, and the trial court granted defendant's motion to suppress the use of the clothes at trial. *Id.* at 515. The police then applied for a warrant authorizing a new seizure of the clothes, which were still being held by the police. In its warrant application, the state "used information derived from that earlier unlawful seizure, *viz.*, the fact that the clothes could be found in a police evidence locker." *Id.* at 521. This court held, relying on that fact, that the defendant "did meet his burden of showing a factual nexus between the evidence at issue and the prior unlawful conduct, and that he succeeded in shifting the burden of persuasion on the issue of taint to the state." *Id.*

Similarly, in this case, Robertson used the fact that defendant's phone could be found in the Gresham Police Department Evidence Division in his search warrant application. Accordingly, defendant established a minimal factual nexus between the unlawful seizure and the evidence learned from the phone. The state does not attempt to distinguish this case from *Johnson*. As we noted previously, however, the phone was not introduced as evidence, and defendant did not object to any testimony or evidence at trial as being derivative of the unlawful seizure other than the interview statements, to which we now turn.

As to the interview statements, defendant argues that there is a factual nexus because, partway through the interview, Robertson described to defendant certain information obtained from the phone, specifically "call logs" and texts between defendant and Pree. Defendant argues that statements he made after being presented with that unlawfully obtained information were derivative of the unlawful retention of the phone. Defendant asserts that Robertson used that information to "put pressure on defendant to change his story."

The record of defendant's interview provides some support for that assertion. For example, among other assertions, defendant first denied talking to Pree on the phone. Later, the officer described data on defendant's phone, including records of phone calls between defendant and Pree, and challenged one of defendant's previous assertions: "You told me that you've never talked to [Pree] on the phone or anything like that before, so I wonder why he has your number in the first place." Defendant argues that certain statements he made after Robertson showed him the phone logs were tainted by police use of information from the unlawfully seized phone, thus demonstrating the kind of nexus required by our cases. The state makes no argument that there is not a factual nexus between the information on the phone that Robertson referred to during the interview and defendant's subsequent statements, and we conclude that defendant met his initial burden.

Because defendant met that burden, the burden shifted to the state to "establish that the challenged evidence was untainted by the illegality." *DeJong*, 368 Or at 642. The state could do so, for example, "either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Johnson*, 335 Or at 520.

As to the call logs and other evidence gained directly from the phone, the state argues that that evidence was obtained from an independent source—specifically, Pree's phone, which the police also had seized, and which contained records of the same calls and texts between the

phones. The state argues that, because of that independent source, defendant would have to establish another basis for suppressing his interview statements than his assertion that they were derivative of the unlawful seizure of the phone. We observe that, although the state presented evidence suggesting that it *eventually* learned of the call records from independent sources, that evidence does not show that the state learned of those call records prior to defendant's police interview. As a result, even accepting the viability of the state's independent source argument, that argument would not resolve whether defendant's interview statements derived from the unlawful seizure of his phone. The state makes no counterargument to that position, other than the procedural arguments discussed below. Because we reject those arguments for the reasons explained below, we conclude, based on the framework articulated in *DeJong*, that at least the three interview statements that defendant challenges should have been suppressed.

C.  *Whether Defendant Preserved His Derivative-Evidence Argument*

The state argues that defendant failed to preserve his argument that certain statements from his interview should have been suppressed as derivative of the phone's seizure. The state acknowledges that defendant moved to suppress the seizure of his phone and "all derivative evidence," but it argues that defendant did not adequately convey to the trial court or the state that that derivative evidence included some of defendant's interview statements. The state recognizes that defendant identified those interview statements later in the hearing after the motion to suppress was denied, but it contends that that discussion was too little, too late, and was not an adequate substitute for identifying the specific interview statements defendant sought to suppress in his written motion or initial argument.

First, we note that the state has provided no authority to support its specific position that defendant's written motion to suppress "the seizure of defendant's cell phone, as well as all derivative evidence" inadequately identified the evidence that defendant sought to suppress. Assuming, without deciding, that the state is correct on that point, we

nevertheless conclude that defendant adequately preserved his claim as to the interview statements.

As we have often reiterated, "the preservation rule is a practical one, and close calls *** inevitably will turn on whether, given the particular record of a case, the court concludes that the policies underlying the rule have been sufficiently served." *State v. Parkins*, 346 Or 333, 341, 211 P3d 262 (2009). Three of the policies underlying preservation guide the outcome in this case.

One is that preservation "gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). In this case, the trial court had a chance to rule (and did rule) on the motion to suppress, as well as to respond to defendant's argument made during the motions *in limine* that portions of the interview were included in that motion.

The second policy is that preservation "ensures fairness to opposing parties, by requiring that the positions of the parties are presented clearly to the initial tribunal so that parties are not taken by surprise, misled, or denied opportunities to meet an argument." *State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011) (internal quotation marks omitted). Here, the state was not taken by surprise, misled, or denied an opportunity to meet that argument, because, when defendant stated that he was preserving his suppression claim as to the interview, the state had a chance to object, or preserve an argument in response, and did not do so.

The third policy is that "preservation fosters full development of the record, which aids the trial court in making a decision and the appellate court in reviewing it." *Peeples*, 345 Or at 219-20. Here, the state has not identified any additional evidence it would have introduced or any other way the record would have been more fully developed had defendant specifically referred to the interview statements in his written motion to suppress.

Additionally, we have observed that, "[p]articularly in criminal cases, in which there is a premium on considerations

of cost and speed, the realities of trial practice may be such that fairly abbreviated short-hand references suffice to put all on notice about the nature of a party's arguments." *Walker*, 350 Or at 550. In the circumstances of this case, the short-hand reference to "all derivative evidence" sufficed, and, if the state believed that defendant's motion to suppress was inadequately specific, it could have challenged it on that ground when the court was hearing that motion.

Taken together, the above considerations underlying preservation indicate that defendant adequately preserved his argument regarding the interview statements. We therefore reject the state's contention that defendant's motion to suppress as to the interview statements was unpreserved.

D.  *Whether the Trial Court's Denial of Defendant's Motion to Suppress Was Harmless Error*

"Although an error occurred in the trial court, we will affirm if there is little likelihood that the particular error affected the verdict." *State v. McKinney/Shiffer*, 369 Or 325, 334, 505 P3d 946 (2022) (internal quotation marks omitted); *see also* Or Const, Art VII (Amended), § 3. In determining whether the error affected the verdict, "we do not determine, as a factfinder, whether the defendant is guilty." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Rather, the question is "whether, after we review the record, we can say that there was little likelihood that the [admission of the derivative evidence] affected the jury's verdict." *Id.*

Defendant argues that the trial court's denial of his motion to suppress was not harmless because certain statements made during his second police interview were inculpatory and prejudicial. Defendant identifies three exchanges from that interview that he contends were not harmless, which we discuss below.

In response, the state contends that the trial court's error was harmless. The state first argues that "the content of any admissions that defendant made after police mentioned the call records were not qualitatively different from the incriminating aspects of his statements before that point." *See State v. Bement*, 363 Or 760, 779, 429 P3d 715

(2018) ("But even when evidence relates to a central factual issue, its exclusion may be harmless if it is 'merely cumulative of,' instead of 'qualitatively different than,' evidence presented to the factfinder." (Quoting *Davis*, 336 Or at 34.)). The state points to significant direct testimony, including lengthy and detailed testimony from the victim that defendant, not Pree, had wielded the knife and cut the victim on the neck and (when the victim tried to push the knife away) on the hand. The victim also testified that defendant, but not Pree, had fled after the robbery. Additionally, the state argues that substantial, uncontroverted physical evidence supported the jury's findings. Police found the victim's wallet and identification and a knife with the victim's blood at the apartment where defendant was staying. The victim's testimony corroborated the state's theory of the case and was consistent with the physical evidence.

In evaluating whether the error was harmless, we consider both the nature and the context of the error. *Davis*, 336 Or at 32-33. Here, the nature of the error is that the trial court refused to suppress the interview statements discussed above. It was undisputed that a robbery had occurred and that someone had attacked the victim with a knife. The only issue was whether that person was defendant, as the state argued, or Pree, as defendant contended. The state offered the interview to support its theory that defendant was lying about Pree using the knife to rob the victim when, the state contended, defendant had not only participated in the robbery but had been the one to use the knife.

As for context, the three exchanges now at issue were part of a much longer interview that lasted around an hour and occurred about a week after the police had interviewed defendant at the hospital. Both of those interviews provide helpful context for the exchanges emphasized by defendant. The statements that defendant made to police during those two interviews were presented to the jury through recordings, which were admitted through Robertson's testimony.[1] (Defendant did not testify at trial.)

---

[1] The interview at the hospital was an audio recording. The second interview was videotaped, and the full interview of about one hour was edited jointly by counsel for the state and defendant to exclude inadmissible or irrelevant material. The edited video of about 24 minutes was played for the jury.

The first recording demonstrated that, while at the hospital, defendant initially identified himself as Marcus Tyler and gave police an identification card to that effect. Shortly thereafter, Robertson—who, as noted, knew defendant from earlier encounters—challenged defendant's statement, saying, "So this is the deal, stud, you're not Marcus Tyler. You are Darius Thompson? Is that your real name?" Defendant immediately acquiesced, admitted that he was Thompson, and confirmed that he had used identification that was not his. Defendant said that the identification was his cousin's and that he used it because he didn't like hospitals. Defendant then went on to tell Robertson that he had been the victim of a drive-by shooting. Defendant's narrative included numerous details, including where he was walking from (a Shari's restaurant) and to (home) and the types of the cars that were purportedly involved (a black Buick and a gray Impala). When asked whether he had wanted to identify or retaliate against the person who he said had shot him, defendant said, "I don't know about that." As Robertson later explained during the hearing on defendant's motion to suppress, defendant was not "forthcoming with information" at the hospital. Instead, defendant was "evasive at times" and gave Robertson "facts that later [Robertson was] unable to verify."

A week later, during defendant's custodial interview at the police station, defendant first repeated the drive-by narrative, as captured in the video played at trial. Defendant claimed that he had been shot by the man who was later identified as the victim of the robbery. Robertson asked how defendant knew who had shot him during the drive-by. Defendant indicated the victim had been bragging around their shared apartment complex about shooting someone, and that a friend of defendant's had brought him the victim's identification card. When first asked about Pree, defendant denied knowing Pree well or that he would be able to identify Pree in a photograph. Defendant indicated that he had never spoken with Pree on the phone, and said, "I really don't associate with him." When asked about the identification that he had presented at the hospital, which defendant had said was his cousin's, defendant now stated that the identification was not from any of his relatives, and that defendant had found the identification.

After defendant had explained his narrative, Robertson challenged defendant, saying, "I know that what you're telling me isn't what happened at all. Okay? I know that something else happened that night * * *." Defendant immediately changed his story again, admitting that there was a robbery—only that Pree, not defendant, attempted the robbery, and that defendant had run away when the robbery began. He then admitted to knowing Pree and to being present at the robbery, although, just a few minutes earlier, he said that he had never spoken to Pree on the phone and would not recognize him. When asked about the knife, defendant stated that the knife used in the robbery would not be found in the apartment where he was staying (although it later was). He also stated that he was "not sure" what kind of knife it was, and, when asked whether Pree still had the knife (because he had asserted that Pree was the one who used the knife), he said, "I don't know," even though, as the police later discovered and the evidence at trial showed, the knife was found in the apartment where defendant stayed. Defendant also, despite his earlier statements claiming he did not know them, identified both Pree and the victim from photographs that were shown to him by police.

All the above discussion occurred *before* Robertson brought up defendant's call records and text messages, and that discussion was not subject to the motion to suppress. Defendant's statements made before Robertson raised the call records and text messages include multiple indications that defendant was not being truthful—about his identity at the hospital, about the cause of the shooting being a robbery, and about details surrounding the robbery such as knowing Pree and being able to identify the victim. Defendant's discussion also included evasive responses to questions posed by Robertson and the other interviewing officer, such as by defaulting to saying "I don't know" in response to various questions (for example, about the type and location of the knife used in the robbery), or not responding audibly at all. At trial, defendant's dishonesty was undisputed. As defense counsel himself argued in closing, "Mr. Thompson lied, no question about that. He lied saying he was Marcus Tyler originally. He lied at other times. He minimized what he did."

With that context, we now turn to the three derivative exchanges that defendant contends were prejudicial. The three exchanges occurred after Robertson raised the call logs and texts that had been found on defendant's cell phone. The challenged statements appear on different pages of the transcript and other, unchallenged questions and responses appear between the three challenged statements. We address the statements individually.

The first exchange challenged by defendant concerned whether Pree used a knife or not during the robbery:

"OFFICER ROBERTSON:   But before you told me that [Pree] had a knife and he held it to [the victim's] neck, and now you're saying that you don't know what he had.

"[DEFENDANT]:   No, I said that (inaudible) I didn't know if he had it on him or not."

Defendant contends that a jury could infer from that exchange that defendant was lying about having the knife, or at least that he was unwilling to positively assert that Pree had the knife.

Such an inference is permissible; however, the evidence is cumulative. Unchallenged portions of the two recordings had already made clear defendant was not being entirely truthful or forthright about the knife. The challenged statement also echoed an earlier, unchallenged statement about whether Pree still had the knife ("I don't know."). And despite defendant's hedging in the challenged exchange, defendant still maintained, after the phone was brought up, that he had not wielded the knife. For example, Robertson asked shortly afterward, "Nobody else there had a knife?" Defendant responded, "I didn't." A bit later, Robertson stated, "Yeah, you guys brought a knife to a gun fight." Defendant countered, "Not me." Throughout defendant's discussions with the police, defendant consistently offered an ambiguous and shifting narrative of the shooting and, eventually, of the robbery. The challenged statement is not qualitatively different from the unchallenged statements that defendant made.

Defendant also points to an exchange about whether defendant was trying to kill the victim:

> "OFFICER ROBERTSON:   Okay. So you're saying you didn't want to kill him?
>
> "[DEFENDANT]:   I don't know."

Defendant contends that a jury could take that statement as an admission of guilt.

In the context of the interview, however, a jury would be unlikely to have understood that statement as an admission of guilt. The statement was sandwiched between much more direct assertions of innocence by defendant. A few moments earlier, Robertson asked, "Will you agree on that[,] that Pree didn't have the knife?" Defendant responded, "I didn't have any weapons on me." And a few moments after, Robertson asked, "Nobody else there had a knife?" Defendant responded, "I didn't. I don't know what Pree had." Having just heard those assertions, a jury would be unlikely to take defendant's statement, "I don't know," as a direct or implicit admission of guilt to either wanting to kill the victim or using a knife. A jury would more likely see it as another aspect of his attempt to evade the line of questioning about his involvement in the robbery at all or whether he, rather than Pree, had the knife. As defendant admits in his briefing in this court, that statement could be viewed as an example of "merely trying to avoid the officer's questions." So understood, that statement is not qualitatively different than defendant's earlier unchallenged and nonderivative interview statements about "not knowing" about various aspects of the confrontation with the victim.

Finally, defendant challenges an exchange about whether defendant wanted to get the victim in trouble for shooting him:

> "[DEFENDANT]: I don't want to—I don't want this dude [the victim] to get in trouble for shooting me (inaudible).
>
> "OFFICER ROBERTSON:   Why would you not want him to get in trouble for shooting you?
>
> "[DEFENDANT]:   Because he didn't know any better, bro. He was just shooting at somebody."

Defendant contends that that exchange, like similar statements by defendant, could lead the jury to "infer that defendant believed that the victim was acting in self-defense, which indicates that defendant had in fact attacked the victim with the knife."

But it is not at all clear that one could reasonably infer from defendant's statements that he believed the victim was acting in self-defense and, from that, infer that it was defendant who wielded the knife, rather than Pree. In isolation, such an inference might be plausible, but, by that point in the trial, the evidence had made it apparent that the victim of the planned robbery had a gun and that those engaged in the robbery (defendant and Pree) had a knife. And the jury already knew, by the time the interview video was shown, that defendant's primary defense was not that a robbery had not occurred or that he had not been present, but rather that it was Pree, not defendant, who had wielded the knife. Defendant's statements about not wanting to get the victim in trouble were in the context of Robertson's further questioning about whether defendant and Pree had brought a knife to the robbery and used it. Shortly after defendant made that statement, Robertson challenged defendant's story as noted above, saying, "Yeah, you guys brought a knife to a gun fight." Defendant responded, "Not me. 'Cause I didn't know Pree was gonna do this." He then said, "I didn't know Pree was going to—going to pull out a knife[.]" Those statements were clear expressions by defendant that he did not bring or use a knife. As with the above exchange about whether defendant wanted to kill the victim, it would be speculative to think that the jury would likely infer that defendant was admitting in his earlier, ambiguous statements that the victim was acting to defend himself from defendant, only to immediately retract that position. At most, the above exchange in context would lead to the inference that defendant was being untruthful, which, as we have explained, was both undisputed and clearly established by the earlier, nonderivative part of the interview.

Moreover, the jury watched the videotaped interview played at trial and would have seen no change in the tone of the conversation or the interaction between the officers and defendant from before the contents of his phone are

mentioned and after that occurred. Although the officers had confronted defendant with inconsistencies in his own statements and inconsistences between his statements and information they had obtained from other witnesses and sources, and defendant had changed his story at times and given multiple versions of his answers, the nature of the interview was the same throughout. More importantly, as discussed in detail above, the content of defendant's statements that the jury heard before the reference to the phone's contents and afterwards did not change appreciably. Defendant had already abandoned the drive-by shooting explanation for his gunshot wound. He had admitted that he knew Pree, that Pree had introduced him to the victim, and that he had been present at the robbery. It would have been clear to the jury that defendant's subsequent statements, like his previous statements, were often evasive, vague, and ambiguous, but not otherwise incriminating.

Finally, the arguments of the parties at trial would have confirmed for the jury that the statements defendant challenges were not considered significant by either party, presumably because they were not different in kind from much of the other evidence that came in without objection. Neither the state nor defendant referred to any of the three challenged statements in their opening statements or closing arguments, other than a brief reference during the state's closing argument, without commentary, to defendant's statement that he "d[idn't] know" whether he wanted to kill the victim. Indeed, during its closing, the state replayed a portion of the videotape interview in which defendant gave his explanation of the crime—how Pree "put a knife" to the victim's neck and the victim got out of the car to shoot Pree. He stated, "This was something Pree did (inaudible)[,] he just wanted me there for like protection or something." But the portion of the video that was replayed was *before* the point at which police confronted defendant with the call logs and texts taken from his phone.

Instead of emphasizing, or even mentioning, the challenged interview statements, the parties' closing arguments focused on whether the victim's extensive testimony about the robbery and shooting, and defendant's and Pree's respective roles, was credible. The arguments also touched

on the physical evidence, including the facts that the victim's wallet and identification were found in the apartment where defendant was staying, as was the knife with the victim's blood on it. The state's arguments also reviewed the victim's consistent testimony that defendant, not Pree, had wielded the knife, and that defendant, not Pree, had fled the scene after the attempted robbery. Both parties argued about the inferences that could be drawn from the specific locations of the individuals involved during the robbery and when the shots were fired. Neither defendant nor the state seemed to believe that the equivocal statements to which defendant now points would make much difference one way or the other in the jury's consideration of the charges.

In sum, our review of the record and consideration of defendant's statements persuades us that the trial court's error in failing to suppress them was harmless. The inferences of guilt that defendant urges us to draw from the three statements are simply not there or are independently supported by unchallenged evidence, rendering the challenged statements cumulative. Accordingly, despite the trial court's error and the state's unlawful retention of defendant's phone without a warrant, we affirm.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.